BEAUNIT OF PUERTO RICO, peticionaria, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada.

Número: JRT-66-2     Resuelto: 6 de mayo de 1966

510

*Fiddler, González y Rodríguez,* y *Juan R. Torruella del Valle,* abogados de la peticionaria; *J. B. Fernández Badillo, Luis M. Rivera Pérez* y *Celia Canales de González,* abogados de la Junta de Relaciones del Trabajo.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Hernández Matos, Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La recurrente es una corporación doméstica que fabrica textiles y opera en el comercio interestatal. En 18 de diciembre de 1962 suscribió un convenio colectivo con la "Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Water District, Puerto Rico Division, AFL-CIO." El convenio se pactó por dos años y expiraría el 18 de diciembre de 1964.

Dicho convenio contiene, entre otras, las cláusulas usuales en esta clase de contratos: descuento de cuotas, taller unionado, arbitraje de las disputas mediante un comité de quejas y agravios, horas de trabajo, escala de salarios, plan de bienestar, etc.

Antes de expirar el convenio, en 21 de octubre de 1964, debido a una elección por consentimiento celebrada entre los obreros del patrono aquí recurrente salió triunfante otra unión, la "Unión de Trabajadores de la Beaunit de Puerto Rico Inc. Independiente." La elección fue administrada por la Junta Nacional de Relaciones del Trabajo. La nueva unión fue certificada como representante de los obreros en 29 de octubre de 1964.

Al producirse la sustitución de la representante de los obreros, ni el patrono ni la nueva unión repudiaron el convenio existente, sino que por el contrario el patrono continuó pagando los salarios establecidos en el convenio concertado con la Seafarers, retuvo el *coffee break* y posteriormente liquidó las vacaciones según acumuladas por los obreros a tenor con lo establecido en el mismo convenio. Aunque la nueva representante fue certificada el 29 de octubre de 1964, ésta y el patrono no se reunieron para iniciar la negociación de un nuevo convenio hasta mediados de diciembre de ese año, época para la cual de todos modos vencía el convenio anterior.

En 30 de noviembre de 1964 el patrono despidió al empleado Modesto Escribano Lugo. El 2 de diciembre de ese año, el nuevo representante, la Unión de Trabajadores de Beaunit de Puerto Rico Inc., requirió por escrito una reunión del Comité de Quejas y Agravios para ventilar el caso del despido de Escribano Lugo. El patrono rechazó la solicitud alegando que desde el momento en que la nueva Unión fue certificada expiró el convenio colectivo firmado con la Seafarers y que por lo tanto no estaba obligada a discutir el despido de Escribano Lugo.

Previos los trámites de rigor—presentación de cargo, expedición de querella, vista pública, etc.—la Junta de Relaciones del Trabajo de Puerto Rico, mediante su Decisión y Orden de 21 de diciembre de 1965, halló a la Beaunit incursa en la práctica ilícita de violación de convenio por ésta rehusarse a ventilar ante el Comité de Quejas y Agravios el despido del empleado Modesto Escribano Lugo. En consecuencia, le ordenó (1) cesar de violar el convenio en cuestión, y el que firmase en el futuro con la Unión de Trabajadores de la Beaunit, y (2) reunirse con los representantes de la Unión para discutir el despido de Escribano Lugo.

Ante nos la peticionaria (1) niega la jurisdicción de la Junta de Relaciones del Trabajo de Puerto Rico para entender en esta controversia, y (2) en los méritos, reitera su posición en el sentido de que no viene obligada a discutir el despido de Escribano Lugo en el Comité de Quejas y Agravios porque al certificarse a la nueva unión el convenio existente —el cual provee para dicho arbitraje—quedó "rescindido automáticamente."

■ El problema jurisdiccional que aquí se nos plantea ya lo hemos resuelto. En *Junta Rel. del Trabajo* v. *I.L.A.*, 73 D.P.R. 616 (1952) resolvimos que no siendo la violación de convenios colectivos una práctica ilícita de trabajo bajo la ley federal pero siéndolo bajo la ley de Puerto Rico, la Junta del Relaciones del Trabajo de Puerto Rico podía intervenir en casos de violación de convenios colectivos aunque se tratase de organizaciones que operasen en el comercio interestatal. Posteriormente, en noviembre de 1962, reexaminamos esa doctrina a la luz de *Guss* v. *Utah L.R.B.*, 353 U.S. 1; *Amalgamated Meat Cutters* v. *Fairlawn Meats*, 353 U.S. 20 y *San Diego Bldg. Trades* v. *Garmon*, 353 U.S. 26, y la reiteramos, *P.R. Telephone* v. *Junta Rel. Trabajo*, 86 D.P.R. 382. En el mismo sentido nos expresamos en *El Mundo, Inc.* v. *J.R.T.*, 92 D.P.R. 834, (1965). La discusión que sobre esta cuestión jurisdiccional hace la Junta de Relaciones del Tra-

bajo de Puerto Rico en su opinión en el caso de autos está muy bien fundamentada pero en vista de lo expresado ya por nosotros en *Junta de Rel. del Trabajo* v. *I.L.A.*, supra, y en *P.R. Telephone* v. *Junta Rel. Trabajo*, supra, no creemos necesario volver a discutir aquí el asunto. Véanse además *Dowd Box Co.* v. *Courtney*, 368 U.S. 502, 506–507; *Local 174* v. *Lucas Flour*, 369 U.S. 95; *Sinclair* v. *Atkinson*, 370 U.S. 195; y *Smith* v. *Evening News Ass'n*, 371 U.S. 195, todos resueltos en el 1962.

Nos dirigimos ahora a la otra cuestión planteada en este caso, esto es, si el patrono venía obligado o no a arbitrar ante el Comité de Quejas y Agravios la controversia surgida con motivo del despido de Escribano Lugo.

■ Al igual que en *P.R. Telephone* v. *Junta Rel. Trabajo*, supra, pág. 397, no es necesario que resolvamos en el presente caso si al decidir sobre la comisión de la práctica ilícita imputada, la Junta de Relaciones del Trabajo de Puerto Rico debe aplicar el derecho laboral federal o el local, pues en cuanto al punto específico que consideramos ambos coinciden ya que se fundan en el respeto a los convenios y en la eficacia del arbitraje. Véanse las autoridades citadas en 86 D.P.R. 397, escolio 12, y además *Republic Steel* v. *Maddox*, .379 U.S. 650 (1965) ; *Rivera Adorno* v. *Autoridad de Tierras*, 83 D.P.R. 258, 265 (1961) ; *Pérez* v. *Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963). [1]

Sin embargo, es útil ver qué han resuelto los tribunales federales en situaciones parecidas a la del caso de autos.

---

[1] Entendemos, naturalmente, la necesidad de que haya un derecho interestatal uniforme, o por lo menos no conflictivo, en los asuntos regidos por ley federal. Véase lo dicho en relación con los casos que los tribunales federales o estatales deban de resolver bajo la Sec. 301 de la Ley Taft-Hartley (29 U.S.C. sec. 185) en *Wiley* v. *Livingston*, 376 U.S. 543, 548 (1964) ; *Local 174* v. *Lucas Flour*, 369 U.S. 95, 103 (1962) ; *Textile Workers* v. *Lincoln Mills*, 353 U.S. 448, 457 (1957).

Cf. Aponte-Pérez, *"The Culmination of the Commonwealth of Puerto Rico in the Field of Labor Relations and Wage and Hour Standards via Compact Federalism,"* 26 Rev. C. Abo. P.R. 13 (1965).

Hay tres casos recientes muy ilustrativos, los cuales examinaremos brevemente.

En *Wiley* v. *Livingston*, 376 U.S. 543 (1964), un nuevo patrono rehusó arbitrar una querella mediante el procedimiento de quejas y agravios que disponía el convenio colectivo basándose en que él (el nuevo patrono) no había sido parte en la contratación del convenio que había firmado el patrono anterior con la unión y que por eso dicho convenio no le obligaba. El Tribunal Supremo de los Estados Unidos resolvió que el patrono venía obligado a arbitrar. Veamos este caso un poco más de cerca.

La unión había contratado un convenio colectivo con el patrono *Interscience Publishers*, el cual expiraría el 31 de enero de 1962. El convenio no contenía cláusula alguna que dispusiese expresamente que el convenio obligaría al sucesor de Interscience. Antes de expirar el convenio, en octubre de 1961, Interscience se fusionó con una empresa mucho mayor llamada *John Wiley & Sons, Inc.* e Interscience cesó sus funciones como una entidad separada. El efecto práctico fue que la firma *Wiley* adquirió a *Interscience* y como consecuencia *Wiley* resultó ser el nuevo patrono de los obreros que antes trabajaban para *Interscience*. Surgió una controversia obrero-patronal relacionada con varios aspectos del convenio. A pesar del requerimiento de la unión de que la controversia se arbitrase conforme a lo dispuesto en el convenio, el nuevo patrono *Wiley* se negó a ello por las razones antes dichas.

Era más difícil sostener en el caso de *Wiley* que el convenio obligaba al patrono que lo que lo es en el caso de autos porque, como ya hemos indicado, en el caso de autos la nueva unión y el patrono continuaron administrando sustancialmente el convenio existente y no fue hasta que surgió la controversia específica sobre el empleado Modesto Escribano que el patrono alegó no estar obligado por el convenio. En

cambio, en el caso de *Wiley* hubo conversaciones entre la unión y la gerencia antes y después de producirse el cambio de patrono, sobre el efecto que dicho cambio tendría sobre el convenio vigente y sobre los derechos de los empleados cubiertos por dicho convenio. Estas conversaciones entre la Unión, Interscience y Wiley no produjeron un acuerdo sobre el particular. De manera que aunque el nuevo patrono Wiley desde el comienzo había impugnado el convenio en el cual él no había sido parte, el Tribunal resolvió que venía obligado a arbitrar conforme lo allí dispuesto.

■ ¿Por qué resolvió el Tribunal Supremo en esa forma? Lo hizo precisa y explícitamente porque el caso de *Wiley*, igual que en el caso de autos, plantea un problema que cae claramente dentro de una política pública que es de principal importancia en la sociedad moderna industrializada. La salud, la seguridad y el bienestar de los habitantes de la sociedad moderna dependen en gran medida de la operación normal de un número de servicios e industrias y por lo tanto fomentar, propiciar y salvaguardar la paz industrial es un fin público de principal importancia tanto en la esfera federal como en la estatal.

En *Wiley*, supra, recuerda el Tribunal Supremo de los Estados Unidos el papel importante que el arbitraje juega en la realización de la política pública laboral y que el arbitraje es el sustituto de la guerra industrial. Señala el Tribunal que se frustraría "la política pública federal de resolver las disputas obrero-patronales mediante arbitraje" si el mero hecho de la sustitución de un patrono por otro tuviese el efecto automático de relevar a las partes del deber de arbitrar previamente pactado. 376 U.S. 549.

Reitera el Tribunal lo que llama "la preferencia de la política laboral federal por el arbitraje" y menciona las "impresionantes consideraciones de política que favorecen el

arbitraje." Págs. 549, 550.(²) Ya en nuestra jurisdicción nos habíamos percatado de que un respaldo judicial vigoroso a la institución del arbitraje obrero-patronal y a los procedimientos de quejas y agravios, es una forma efectiva de proteger y propiciar la paz industrial. *Rivera Adorno* v. *Autoridad de Tierras*, 83 D.P.R. 258, 265 (1961); *Pérez* v. *Autoridad de Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963).

*Wackenhut Corp.* v. *Plant Guards*, 332 F.2d 954 (1964); 56 L.R.R.M. 2466, es el segundo caso federal que vamos a discutir. Allí se planteó una situación parecida a la del caso de *Wiley*. General Plants Protection Co. había firmado un convenio colectivo con la unión. Estando dicho convenio en vigor Wackenhut Corp, compró la empresa. En el contrato de compra el nuevo patrono no asumió en forma expresa las obligaciones que imponía el convenio colectivo vigente. Surgieron controversias obrero-patronales y la unión exigió que Wackenhut concurriese al arbitraje según lo dispuesto en el convenio. Basándose en "la política pública contenida en las leyes laborales nacionales" y citando el caso de *Wiley*, supra, el Tribunal resolvió que el nuevo patrono estaba obligado a arbitrar conforme lo provisto en el convenio acordado entre la unión y el patrono anterior. El Juez Hamley, juez ponente en este caso, expresó que luego de leer la opinión del Tribunal Supremo de los Estados Unidos en el caso de *Wiley* estaba convencido de que la decisión allí tomada no se fundaba en estrechas consideraciones sino que dicha opinión estaba basada en un enfoque amplio y conforme con la política pública federal laboral. 332 F.2d 958.

▇ Expresó el Tribunal en dicho caso de *Wackenhut* que el convenio colectivo había conservado su vigencia, no empece que una de las partes había sido sustituida por otra, y

---

(²) Para discusiones de esas consideraciones allí aludidas véanse *United Steelworkers* v. *American Mfg. Co.*, 363 U.S. 564; *United Steelworkers* v. *Warrior & Gulf Co.*, 363 U.S. 574; *United Steelworkers* v. *Enterprise Corp.*, 363 U.S. 593; *Pérez* v. *Autoridad de Fuentes Fluviales*, 87 D.P.R. 118.

señaló que se había mantenido una similitud sustancial de operación y de continuidad en la identidad de la empresa antes y después del cambio. Igual ocurre en el caso de autos; los representantes de una parte han variado pero el cuerpo de obreros, la clase de operación y la identidad de la empresa ha continuado sustancialmente igual.

El tercero y último caso federal que vamos a reseñar en este sentido es el de *United Steelworkers* v. *Reliance Universal Inc.*, 335 F.2d 891 (1964) ; 56 L.R.R.M. 2721. El convenio colectivo en este caso regiría desde septiembre de 1962 hasta julio de 1964. En septiembre de 1963 el patrono le vendió la empresa a otro. Surgieron disputas obrero-patronales y la unión exigió que el nuevo patrono concurriese al arbitraje según lo pactado en el convenio. Éste se negó y el Tribunal resolvió que el nuevo patrono debía arbitrar conforme lo dispuesto en el convenio colectivo. Aquí también el Tribunal, a través del magistrado ponente, Sr. Juez Hastie, aludió a la "vigorosa" política pública federal en favor de que las disputas obrero-patronales se resuelvan mediante arbitraje. 335 F.2d 894.

Los tres casos anteriormente examinados, *Wiley*, *Wackenhut* y *Reliance*, demuestran claramente que la política judicial federal sobre esta materia, consistente con la política legislativa, es la de (1) hacer cumplir los convenios colectivos por ambas partes y (2) respaldar decididamente los procedimientos de arbitraje en la solución de las disputas obrero-patronales. Como hemos ya señalado, igual es la nuestra.

La recurrente cita en su apoyo dos casos de fecha anterior a los antes reseñados en esta opinión, los cuales no resuelven el punto suscitado en el caso de autos. Estos dos casos son el de *American Seating Co.*, 106 N.L.R.B. 250 (1953) y el de *Boston Machine Works Co.*, 89 N.L.R.B. 59 (1950).

En *American Seating*, la situación de hechos y el punto envuelto eran distintos a los del caso de autos. Allí la Junta

aplicó el conocido principio de que un convenio colectivo cuyo término de duración es irrazonable no será obstáculo (*bar*) para la celebración de elecciones, y resolvió que el patrono se negó a negociar con la unión, luego de haber sido requerido por ésta para negociar un convenio, y que violó la Sec. 8(a)(5) de la ley, 29 U.S.C. § 158(a)(5). Como puede verse los elementos de este caso son distintos a los del caso de autos.

*Boston Machine*, supra, tampoco es aplicable al caso de autos. Allí se planteó una controversia sobre representación. La situación en la empresa concernida llegó a tal extremo que el patrono no sabía con qué grupo debía negociar. Ante la confusión que se produjo sobre quién era el representante de los obreros la Junta ordenó elecciones. La Junta llegó a la conclusión de que de no hacerlo se obstaculizaría el proceso de negociación colectiva. Allí la Junta rehusó expresamente decidir sobre el efecto que la elección y la certificación tendrían sobre el convenio colectivo. 89 N.L.R.B. 61.

Conviene recordar que la política pública de las leyes federales de relaciones del trabajo consistente en promover la paz industrial (29 U.S.C. §§ 141 y 151), y la política pública de Puerto Rico sobre la misma materia, según expresada en la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 62, son no solamente compatibles sino que son iguales en lo esencial. Una lectura de los estatutos arriba citados así lo comprueba. Véase Barela, *The Puerto Rico Labor Relations Act: A State Labor Policy and Its Application*, Editorial Universidad de P.R. (1965) pág. 22. Allí expresa el autor ([3]) que "si en algún pronunciamiento están resumidos la naturaleza y los objetivos de la Ley de Relaciones del Trabajo de Puerto Rico, es en el que hizo el Presi-

---

([3]) Barela sirvió por tres años en la Junta Nacional de Relaciones del Trabajo y presidió por quince la Junta de Relaciones del Trabajo de Puerto Rico.

dente Franklin D. Roosevelt el 5 de julio de 1935 al firmar la Ley Wagner." (⁴)

■ La solución dada al problema aquí planteado por los tribunales en los citados casos de *Wiley* v. *Livingston, Wackenhut* v. *Plant Guards* y *United Steelworkers* v. *Reliance*, supra, nos parece racional y conveniente para mantener la paz industrial. (⁵) Parece muy razonable que el mero hecho de una sustitución de un patrono por otro, o de un representante de los obreros por otro, no debe abolir automáticamente el convenio existente entre la empresa y los obreros. Lo contrario dejaría automáticamente a las partes sin la ley entre ellos—el convenio—y los pondría de inmediato en estado de guerra industrial. Eso sería contrario a la conveniencia social—que es por ello a la vez la política pública federal y la de Puerto Rico, consagrada en la leyes y en la jurisprudencia—de que exista paz industrial.

■ Por el contrario, si el mero cambio de patrono o de representante obrero no extingue el convenio, las partes pueden continuar administrándolo en paz, como lo han venido haciendo hasta entonces y de creerlo conveniente las partes siempre pueden mediante acuerdo mutuo hacerle los cambios que acuerden. Esto no sería opresivo para ninguna de las partes porque de todos modos ni la Junta Nacional de Relaciones del Trabajo ni la Junta de Relaciones del Trabajo de Puerto Rico protegen la vigencia de convenios de duración irrazonablemente larga. Como hemos indicado, es un principio bien establecido en ambas jurisdiciones que un convenio de duración irrazonablemente larga no sería obstáculo para una elección y para una nueva negociación.

---

(⁴) El pronunciamiento del Presidente aparece en *National Labor Relations Board, Legislative History of the National Labor Relations Act*, U.S. Gov't Printing Office, Wash. (1949) Vol. II, pág. 3269. También lo reproduce parcialmente Barela en su libro, págs. 22–23.

(⁵) V. Smith & Jones, *"The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law,"* 63 Mich. L. Rev. 751, 775 (1965).

■ La continuación del convenio existente, hasta que éste sea variado a través de los procesos legales, asegura un clima de certidumbre y de paz en la industria. A nadie se le ocurriría pensar, por ejemplo, que porque en un país un partido político que no es el que está gobernando gane las elecciones eso quiere decir que ese país se queda automáticamente sin leyes y que se cae en un interregno caótico en el que no hay que cumplir con los contratos ni observar las leyes hasta que el nuevo gobierno legisle de nuevo todas las leyes y códigos. Igual debe ser en cuanto a los convenios colectivos que son en efecto la ley privada entre los obreros y la gerencia. V. *Steelworkers* v. *Warrior & Gulf Co.*, 363 U.S. 574, 578–579; Cox, *"Reflections Upon Labor Arbitration,"* 72 Harv. L. Rev. 1482, 1498–1499 (1959); Shulman, *"Reason, Contract and Law in Labor Relations,"* 68 Harv. L. Rev. 999, 1004–1005 (1955).

■ También conviene tener presente, porque parece que se olvida, que las uniones no son las beneficiarias de los convenios colectivos, sino que los beneficiarios son los obreros, en aquella medida en que los convenios les confieren beneficios de cualquier clase. El convenio, claro, es un contrato entre la empresa y los obreros y para que tenga éxito permanente tiene que proporcionar beneficios económicos a ambas partes. Salvo por consideraciones excepcionales, ningún obrero trabajaría gratis y ningún patrono operará por largo tiempo una empresa que sólo le cause pérdidas.

■ Los beneficiarios, en la parte que les corresponde, son pues, los obreros y no las uniones. Las uniones y sus oficiales son *los representantes* de los obreros. De igual manera las empresas tienen sus representantes que las representan en la mesa de conferencia. Las partes sustantivas en la relación obrero-patronal son los obreros y los patronos y no sus respectivos agentes o representantes. Son los patronos los que ponen el capital y asumen el riesgo y son los obreros los que trabajan y los que, a través de sus representantes,

negocian colectivamente. De igual forma que el gobierno existe para servir al país y no el país para servir al gobierno, de igual forma que los jueces ocupamos nuestros cargos para servir a la justicia y no a la inversa, así también las uniones existen para servir a los obreros y no los obreros para servir a las uniones.

■ Un último punto planteado por la recurrente nos resta atender. Expresa la recurrente que aún asumiendo que el patrono viniese obligado a arbitrar, el arbitraje no procede porque la unión no cumplió completamente con el procedimiento establecido en el convenio para llevar asuntos al Comité de Quejas y Agravios. Tal objeción no es válida. La unión requirió por escrito a la recurrente que la controversia sobre el despido del empleado Escribano Lugo se ventilase ante el Comité de Quejas y Agravios. Sin embargo la posición del patrono fue que no lo haría porque ya no existía convenio porque el mismo había expirado. Ante tal situación hubiera sido fútil de parte de la unión cumplir con unos detalles procesales cuando ya de antemano conocía la posición negativa del patrono sobre el particular. Estos procedimientos previos al arbitraje no funcionan en un vacío; funcionan en la realidad del caso y ya hemos visto cuál era esa realidad. Idéntico planteamiento se hizo en *Wiley* v. *Livingston,* supra, y se resolvió en idéntica forma que aquí lo hacemos. 376 U.S. 555–556.

*Se desestimará el recurso de revisión de la recurrente y se dictará sentencia poniendo en vigor la Decisión y Orden de la Junta en este caso, en tanto en cuanto tiene el efecto de ordenar que la controversia sobre el despido de Escribano Lugo se ventile ante el Comité de Quejas y Agravios.*