JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada.

*Número:* O-76-536      *Resuelto:* 26 de junio de 1979

*Gladys J. Ramos Rosario,* abogada de la peticionaria; *Marcelino Delgado Medina,* abogado de la demandada.

El Juez Asociado Señor Irizarry Yunqué emitió la opinión del Tribunal.

Este caso versa sobre la obligación contraída por un patrono, en virtud de un convenio colectivo, de descontar de la paga de sus empleados y remesar a la unión que les representa las cuotas de afiliación que éstos deben pagar. Se plantea si el trámite iniciado por otra unión para ser certificada por la Junta de Relaciones del Trabajo impide que opere una cláusula de renovación automática del convenio y si, de haberse renovado el convenio en virtud de dicha cláusula, actúa correctamente el patrono y no incurre en práctica ilícita de trabajo al remesar a la primera unión lo descontado para cuotas, no obstante haber sido certificada la segunda como representante exclusiva de los empleados y tener conocimiento de ello el patrono para la fecha de la remesa. Se plantea, además, si la Junta, en el supuesto de hallar al patrono incurso en la práctica ilícita, tiene facultad para, al ordenar al patrono devolver a los empleados lo descontado, imponerle como penalidad el pago de una suma adicional igual.

# I

Los hechos no están controvertidos. La Unión de Empleados Profesionales de la Autoridad de las Fuentes Fluviales— en adelante UPAFFI—formuló un cargo por práctica ilícita de trabajo contra la Autoridad de las Fuentes Fluviales a base del cual la Junta de Relaciones del Trabajo de Puerto Rico expidió querella en que alegó, en lo aquí pertinente, lo siguiente:

"3. Que hasta el 2 de julio de 1971, fecha en que expiró el convenio anterior, la Brotherhood of Railways, Airlines and Freight Handlers, Express and Station Employees, AFL–CIO era la representante exclusiva de los empleados profesionales utilizados por la querellada.

"4. Que la querellante, previo un procedimiento de representación, fue certificada por la Junta el 21 de julio de 1971, asumiendo así la representación exclusiva de los antes mencionados empleados.

"5. Que no obstante este hecho, el 16 de agosto de 1971 la querellada remesó a la anterior unión cuotas descontadas a los empleados profesionales para la quincena del 3 al 17 de julio de 1971, cuando ésta ya no representaba a dichos empleados.

"6. Que la conducta anteriormente señalada constituye una práctica ilícita de trabajo a tenor con el Artículo 8, Sección 1, Inciso (b) de la Ley."

La Autoridad contestó oportunamente la querella. Aceptó lo alegado en el transcrito párrafo 4, negó el 3 y el 6, y en cuanto al 5 expresó:

"De las alegaciones del párrafo 5 admite que realizó el descuento y envío de cuotas a la Brotherhood of Railways, Airline and Freight Handlers, Express and Station Employees, AFL– CIO, (BRAC), pero niega que durante la quincena del 3 al 17 de julio dicha Unión no fuera la representante de los empleados."

La contención de la Autoridad, invocada en sus defensas afirmativas, se centró en su alegación de que hasta el 21 de julio de 1971, fecha en que la UPAFFI fue certificada por la Junta como representante de los empleados, rigió el convenio

colectivo que existía entre ella y la BRAC, y que el descuento de cuotas y su envío a la BRAC se hizo de conformidad con los términos de dicho convenio.

Luego de los correspondientes trámites administrativos la Junta halló probado el cargo e incursa a la Autoridad en la práctica ilícita imputádale. En consecuencia, además de ordenarle cesar y desistir de incurrir en tal práctica, le requirió "[reembolsar] a todas las personas que se determine eran empleados profesionales de la querellada a quienes se le descontaron cuotas durante la quincena comprendida entre el 3 y el 17 de julio de 1971, la diferencia en salario que no se les pagó más una suma igual por concepto de doble penalidad y en adición, los intereses legales correspondientes." La Junta nos ha solicitado que pongamos su orden en vigor y la Autoridad se opone.

■ No se discute ante nos que el descuento de las cuotas y su envío a una unión que no representa a los empleados constituye una práctica ilícita de trabajo en violación de la Sec. 8(1)(b) de la Ley de Relaciones del Trabajo, 29 L.P.R.A. sec. 69(1)(b).[1] Esta disposición considera práctica ilícita de trabajo el que un patrono:

"(b) Inicie, constituya, establezca, domine, intervenga o intente iniciar, constituir, establecer, dominar o intervenir con la formación o administración de cualquier organización obrera, o contribuya a la misma con ayuda económica o de otra clase; Disponiéndose, que no se prohibirá a un patrono deducir suma alguna de dinero del salario, ganancias o ingresos de un empleado para el pago de cuotas a una organización obrera cuando tal deducción sea requerida en virtud de los términos de un convenio colectivo celebrado entre el patrono y una organización obrera no establecida, mantenida o ayudada por acción alguna definida en este subcapítulo como práctica ilícita de trabajo, si dicha organización obrera es el representante de una mayoría de sus em-

---

[1] Se ha reconocido bajo la ley federal de relaciones del trabajo, en *Stainless Steel Products, Inc.*, 157 N.L.R.B. 232 (1966), que ello constituye una práctica ilícita de trabajo.

pleados según lo provisto por la sec. 66(1) de este título en una unidad apropiada cubierta por tal convenio."

El convenio que aquí nos ocupa fue suscrito en abril de 1969 entre la Autoridad y BRAC como representante de los empleados profesionales, para regir hasta el 2 de julio de 1971. Su artículo XLIX disponía, sin embargo, en su inciso A, que el convenio continuaría en vigor después de su vencimiento "por años subsiguientes con todas sus propiedades a menos que una de las partes notifique por escrito a la otra su deseo de modificarlo a más tardar seis (6) meses antes de su vencimiento."

La prueba estableció que el 9 de septiembre de 1970, es decir, casi diez meses antes del vencimiento, UPAFFI inició trámites ante la Junta de Relaciones del Trabajo para "investigación y certificación" como representante de los empleados profesionales de la Autoridad. Hubo más tarde—el 22 de febrero—un desistimiento sin perjuicio, y luego se renovaron las gestiones de la UPAFFI, que culminaron con la celebración de elecciones el 2 de julio, día en que vencía el convenio, elecciones que ganó la UPAFFI, siendo certificada el 21 de julio como representante exclusiva de dichos empleados.

## II

■ Arguye la Autoridad que la mera presentación a la Junta de la solicitud de investigación y certificación hecha el 9 de septiembre de 1970 no constituía la notificación requerida por el convenio, ni impedía su renovación automática. No estamos de acuerdo. Presentada la solicitud mucho antes de los seis meses que faltaban para el vencimiento del convenio, pudo tener el efecto de impedir la prórroga. No tenía que ser la BRAC quien diera el aviso requerido por la cláusula que nos ocupa. El fundamento lo expresó con claridad la Junta Nacional de Relaciones del Trabajo en *In the Matter of Mill B., Inc.*, 40 N.L.R.B. 346, 351, (1942), al expresar:

"La salvaguardia contra la perpetuación por inercia de un representante negociador . . . . radica en el poder de los empleados de notificar dentro del término especificado en el convenio su reclamo a tener un nuevo agente negociador. Debe tenerse presente siempre que las organizaciones obreras son meramente agentes de los empleados en una unidad apropiada. No vamos tan lejos como sostener que solamente la unión que es una parte en el convenio puede notificar la intención de terminarlo antes de que opere la cláusula sobre renovación. Los empleados pueden lograr el mismo resultado si ellos mismos significan su intención de designar un nuevo representante, ya sea mediante notificación directa al patrono o mediante la formulación de una petición ante la Junta."

En *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509, 520 (1966), hicimos expresiones parecidas. "También conviene tener presente," dijimos, "porque parece que se olvida, que las uniones no son las beneficiarias de los convenios colectivos, sino que los beneficiarios son los obreros, en aquella medida en que los convenios les confieren beneficios de cualquier clase." Y más adelante, en la misma página, señalamos: "Las partes sustantivas en la relación obrero-patronal son los obreros y los patronos y no sus respectivos agentes o representantes."

■ El desistimiento por UPAFFI de su solicitud, hecho el 22 de febrero de 1971 y ya dentro del período de los seis meses anteriores al vencimiento del convenio, pudo tener el efecto de anular la notificación de no renovar a que equivalió la presentación de la petición en septiembre. Pero no puede pasarse por alto que se hizo sin perjuicio, y que según surge de los autos, ya el 19 de enero UPAFFI había presentado otra petición a los mismos fines.

■ La fraseología de la cláusula de renovación automática es, por otra parte, de dudosa obligatoriedad en cuanto a impedir a los empleados dar por vencido el contrato y celebrar elecciones. Dicha cláusula dice: ". . . y continuará en vigor por años subsiguientes con todas sus propiedades . . . ." Cláusulas redactadas en términos similares han sido consi-

deradas en el ámbito federal como que establecen prórrogas de duración indefinida. Véanse *Lane Aviation Corp. and Teamsters Union*, 211 N.L.R.B. 824 (1974); *Hope Webbing Co.*, 119 N.L.R.B. 145 (1957); *Fawcett-Dearing Printing Co.*, 106 N.L.R.B. 21 (1953). Se ha resuelto que tales cláusulas no impiden que el convenio sea terminado por voluntad de cualquiera de las partes. *Fawcett-Dearing*, supra, pág. 22, escolio 4. Véase también *Hope-Webbing*, supra. Se resolvió en *Pacific Coast Associates*, 121 N.L.R.B. 990, 993 (1958), que los convenios de duración indefinida no impiden la celebración de elecciones. Señalamos en *Beaunit of Puerto Rico* v. *J.R.T.*, supra, pág. 519, que "un convenio de duración excesivamente larga no sería obstáculo para una elección y para una nueva negociación" tanto en nuestra jurisdicción como en la federal.

Independientemente de las normas que hemos expuesto en cuanto a la terminación del convenio, la Autoridad estaba impedida en este caso, por sus propios actos, de seguir remesando a la BRAC las cuotas descontadas a sus empleados. La Autoridad no negó al contestar la demanda que la remesa se hizo el 16 de agosto de 1971. Ya para esa fecha sabía que la unión certificada como representante exclusiva de sus empleados profesionales era la UPAFFI. Dicha unión fue certificada el 21 de julio de 1971, y entonces comenzaron negociaciones entre UPAFFI y la Autoridad para concertar un nuevo convenio.

Más aun, el 4 de agosto de 1971 la Autoridad y UPAFFI llegaron a un acuerdo que hicieron figurar por escrito y suscribieron, el cual contiene las siguientes estipulaciones:

"1. Adoptar el convenio colectivo que firmaron el 25 de abril de 1969 la AUTORIDAD y la Brotherhood of Railway, Airline and Freight Handlers, Express and Station Employees, AFL-CIO, Unión que representaba anteriormente a los empleados profesionales de la Autoridad. Se entenderá que el convenio colectivo se adopta en su totalidad salvo como más adelante se especifica.

2. Cuando el convenio colectivo antes referido se haga alusión a la 'Brotherhood of Railway, Airline and Freight Handlers, Express and Station Employees, AFL–CIO', o a la 'Brotherhood', o a 'la Local de la Brotherhood', se entenderá para todos los efectos que se refiere a la UPAFFI.

3. La UPAFFI queda relevada del requisito de la notificación de seis meses establecido en el apartado (a) del Artículo XLIX.

5. El acuerdo contenido en esta estipulación estará vigente desde el 3 de julio de 1971 hasta tanto se firme el convenio colectivo que las Partes han comenzado a negociar."

Como hemos señalado, ese acuerdo se firmó el 4 de agosto. No obstante que expresamente se dispuso que donde se hiciera referencia en el convenio a la BRAC "se entenderá para todos los efectos que se refiere a la UPAFFI" doce días más tarde, el 16 de agosto, la Autoridad remesó a BRAC, que ya no representaba a sus empleados, los dineros descontados a éstos. La BRAC no les representaba desde el 3 de julio por haberse hecho retroactivo a dicha fecha (párrafo 5 del acuerdo) las estipulaciones entre la Autoridad y UPAFFI. Para la fecha en que remesó los descuentos a la BRAC no podía ignorar el acuerdo contraído con UPAFFI.

La A.F.F. cita en su apoyo los casos de *J.R.T.* v. *A.M.A.*, 91 D.P.R. 500 (1964); *Beaunit of Puerto Rico* v. *J.R.T.*, 93 D.P.R. 509 (1966); *Fender Musical Instruments*, 175 N.L.R.B. 873 (1969); *N.L.R.B.* v. *Swift*, 294 F.2d 285 (1961); y *Suburban Transit Corp.* v. *N.L.R.B.*, 86 L.R.R.M. 2627 (1974).

Los casos de *J.R.T.* v. *A.M.A.*, supra; *Beaunit of Puerto Rico* v. *J.R.T.*, supra; y *Fender Musical Instruments*, supra, son distinguibles del caso de autos por tres razones. En primer lugar, ninguno presenta la operación de una cláusula de renovación auomática, por el contrario, los tres presentan un convenio colectivo de duración determinada. Segundo, los tres presentan convenios colectivos que no habían vencido al momento en que se realizó el acto que se imputa como práctica ilícita del trabajo. Tercero y último, en esos tres casos las

elecciones y la certificación se produjeron antes de la fecha establecida en el convenio para su expiración. En el caso de autos lo que se plantea es precisamente si operó la cláusula de renovación automática y las elecciones y la certificación se produjeron luego de la fecha de expiración del convenio.

Pasemos a los casos de *N.L.R.B.* v. *Swift*, supra, y *Suburban Transit Corp.* v. *N.L.R.B.*, supra. El segundo de ellos es una reafirmación de la doctrina establecida en el primero. Ninguno tiene valor persuasivo para lo planteado ante nos, en primer lugar, porque se refieren a la doctrina de *Midwest Piping & Supply Co.*, 63 N.L.R.B. 1060 (1945), que tampoco es aplicable al caso de autos. Según dicha doctrina, constituye una práctica ilícita el que un patrono reconozca y negocie con una de dos o más uniones como representante exclusivo mientras está pendiente la petición de certificación de otra unión rival y exista una verdadera cuestión sobre representación. Esa situación de hechos no está presente en autos.

En segundo lugar, el caso de autos no presenta una reclamación "desnuda de representación mayoritaria" (*"naked claim of majority representation"*) como en *Swift*, supra. Allí nunca se ordenó o celebró una elección, ni se logró reunir el 30% de los empleados para la solicitud de certificación. En el caso de autos se presentaron tres peticiones por la misma unión, culminando el proceso en una elección y certificación de una nueva representante.

En conclusión, el convenio que suscribieron la BRAC y la Autoridad cesó a su vencimiento el 2 de julio de 1971. La oportuna solicitud de investigación y certificación presentada por la UPAFFI a la Junta el 9 de septiembre de 1970, impidió su renovación automática. Sin embargo, el acuerdo entre la UPAFFI y la Autoridad suscrito el 4 de agosto de 1971, tuvo el efecto de renovar dicho convenio provisionalmente a partir del 3 de julio de 1971, y desde entonces era la UPAFFI y no la BRAC la unión que representaba a los empleados.

III

Consideraremos el aspecto de la penalidad impuesta, es decir, el pago de lo descontado más una suma igual. Convenimos con la Autoridad en que se trata de una medida punitiva y no reparadora, que es lo que contempla la Ley de Relaciones del Trabajo. *Rivera* v. *J.R.T.*, 70 D.P.R. 5, 13 (1949).

Para que un remedio sea reparador, la acción afirmativa que se ordena "debe propender a garantizar a los empleados aquellos derechos que el estatuto consagra, entre los cuales se destacan el de negociar colectivamente, y como corolario indispensable, el de disfrutar de los beneficios que se logran a través de la negociación. La acción afirmativa que contempla la Ley se dirige a restituir al empleado afectado por la comisión de las prácticas ilícitas a las misma posición que ocuparía de no haberse observado la conducta detrimental." *J.R.T.* v. *Ceide*, 89 D.P.R. 674, 685–686 (1963). La suma igual adicional aquí ordenada por la Junta, si bien engrosaría el patrimonio de los empleados, no persigue con ello repararles ningún perjuicio. El descuento indebidamente hecho queda compensado con su devolución, más los intereses. La imposición del pago de una suma igual es claramente punitiva. La autorización para este tipo de imposiciones debe surgir con claridad de algún estatuto. *Salgado* v. *Tribunal Superior*, 92 D.P.R. 367, 372 (1965) y casos ahí citados. No se nos ha citado, ni hemos hallado ley alguna, que lo autorice.

La Junta cita en su resolución el caso de *J.R.T.* v. *Milares Realty, Inc.*, 90 D.P.R. 844 (1964), para sostener su facultad para imponer la penalidad que aquí consideramos. Dicho caso es completamente inaplicable. Allí ni se impuso una doble compensación por la Junta ni se planteó si la Junta tenía facultad para imponer tal tipo de penalidad. Únicamente se impuso el pago del salario dejado de percibir por los obreros despedidos.

En *Colón Molinary* v. *A.A.A.*, 103 D.P.R. 143 (1974),

concluimos que en ausencia de estatuto, convenio colectivo o contrato particular que así lo reconozca, no procede la imposición de penalidades en casos de reposición por despido. Mucho menos proceden en casos de prácticas ilícitas en las que su imposición no constituiría una medida reparadora.

*Se enmendará la orden de la Junta de Relaciones del Trabajo para eliminar la imposición de una suma igual como penalidad y así modificada se dictará sentencia poniendo en vigor dicha orden.*

El Juez Asociado Señor Díaz Cruz no intervino.