DOMINGO RIVERA ADORNO, querellante y apelante, *v.* AUTORIDAD DE TIERRAS DE PUERTO RICO, querellada y apelada.

*Número:* 12508. *Resuelto:* 28 de julio de 1961.

---

*Vicente Géigel Polanco* y *Vicente Géigel Lanuza,* abogados del apelante; *Ramón Gandía Biscombe, Gustavo de Pedro* y *José E. Franco Santiago,* abogados de la apelada.

Sala integrada por el Juez Asociado señor Blanco Lugo, como Presidente de Sala, y los Jueces Asociados señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se plantea si la sumisión a arbitraje de una controversia por el patrono y por la unión, a tenor con disposiciones expre-

sas del convenio colectivo, obliga a un obrero miembro de la unión que personalmente se opuso a la sumisión.

El querellante, Domingo Rivera Adorno, trabajó en la Central Plazuela durante los períodos de zafra de los años 1951 al 1956, primero como ayudante azucarero y desde el 1954 en adelante en calidad de primer azucarero. Son estos azucareros, o azucareros de oficio como también le llaman, los empleados encargados de operar los tachos. La Central Plazuela, sita en el municipio de Barceloneta, era para esos años, y es al presente, propiedad de la Autoridad de Tierras, una corporación pública del Estado Libre Asociado de Puerto Rico creada por la Ley núm. 26 de 12 de abril de 1941, 28 L.P.R.A. sec. 242.

El querellante era miembro de la Asociación de Azucareros Profesionales de Puerto Rico y prestaba servicios bajo convenios colectivos de trabajo celebrados entre la Autoridad de Tierras y la mencionada Asociación de Azucareros Profesionales. Cuando ocurrió el despido que motiva este caso estaba en vigor un convenio colectivo fechado a 23 de abril de 1956, retroactivo al comienzo de la zafra de ese año y que vencería el 31 de diciembre de 1959. Disponía el convenio que el patrono pagaría a cada primer azucarero por una zafra de 21 semanas $2,800 en el año 1956, $2,800 en el 1957, $2,900 en el 1958 y $3,000 en el 1959.

En lo pertinente la cláusula sexta del convenio colectivo disponía como sigue:

"*Comité de Quejas y Agravios*. La Asociación designará un representante de la Central Cambalache de Arecibo, P. R. y otro en Central Plazuela de Barceloneta, P. R. que serán un azucarero de los empleados por la Autoridad y que preste servicios en el referido molino azucarero, para velar por el estricto y fiel cumplimiento de este contrato, por la disciplina de los azucareros compañeros suyos de faenas y por el mantenimiento de las mejores relaciones entre las partes contratantes, conjuntamente con otro representante de la Autoridad, *formarán el Comité de Quejas y Agravios que tratará de resolver armónicamente, cualquier diferencia o queja que pudiere ocurrir entre las partes durante la*

*vigencia de este contrato.* Si el Comité así constituido (por los representantes, uno de cada parte) no pudiere ponerse de acuerdo ·con la solución de una disputa dentro de un término de veinti-·cuatro (24) horas, dicha disputa se someterá a la consideración ·de un tercer miembro. *La decisión de este tercer miembro será final y obligatoria para las partes.* Queda convenido por las partes que el tercer miembro lo será el Conciliador Insular, o la persona que éste designare para sustituirlo." (Enfasis suplido.)

A fines del año 1956 el patrono informó al querellante que no sería empleado en la zafra del 1957 ni en zafras subsiguientes. Como el querellante no estuviese de acuerdo con el despido el patrono solicitó un arbitraje en virtud de las disposiciones de la cláusula sexta del contrato de trabajo antes transcritas. El Comité de Quejas y Agravios, compuesto por un representante de la unión y otro del patrono, no logró ponerse de acuerdo sobre la decisión de la controversia y acordaron someter el asunto al tercer miembro. El 6 de marzo de 1957 el señor Adolfo Collazo, Director del Negociado de Conciliación y Arbitraje del Departamento del Trabajo de Puerto Rico designó al señor Rafael Font González para actuar de tercer miembro y entender en la querella.

El 15 de marzo de ese año de 1957, previa citación al efecto, el Sr. Font González se reunió con los representantes de las partes para ver el caso en su fondo pero a petición del abogado del querellante, con cuya solicitud parece que el patrono también concurrió o estuvo de acuerdo, se suspendió la vista. Luego de otras posposiciones solicitadas "por las partes" (no se dice en el laudo por cuál de ellas o si por ambas) se fijó el día 2 de mayo de 1957 para ver el caso. Ese día acudieron a la reunión el representante del patrono y el Sr. Antonio Pérez Carrera, presidente de la unión, pero no asistieron el querellante Sr. Domingo Rivera Adorno ni su abogado. En vista de la ausencia del querellante y de su abogado el tercer miembro inquirió del presidente de la unión los motivos de dicha ausencia y éste expresó que había citado personalmente al querellante para la vista. Se hizo otro esfuerzo por lograr la

asistencia del Sr. Rivera Adorno a la vista y según lo expresa el laudo "A tal efecto, se suspendió temporalmente el comienzo de la vista del caso en lo que el Presidente de la Unión se trasladaba en automóvil, como en efecto se trasladó, a Vega Baja, para invitar al señor Rivera Adorno a comparecer a la vista de arbitraje de su propio caso. Aproximadamente a las doce del mediodía regresó el señor Pérez Carrera, de Vega Baja, y nos manifestó que el señor Rivera Adorno no comparecería a la vista del caso porque su abogado había ya sometido al árbitro, y enviado por correo, el alegato correspondiente, y que su presencia en la vista de arbitraje no era, por tanto, necesaria, y que así se lo había aconsejado su asesor legal. Se llevó récord taquigráfico de todo lo relacionado con estos trámites y se procedió a ver en su fondo el caso de arbitraje."

Se sometió a la decisión del tercer miembro la siguiente cuestión: "Determinar si la alegada suspensión del azucarero, señor Domingo Rivera Adorno, fue o no justificada, a la luz del convenio colectivo." Las partes (la unión y el patrono) convinieron en que el tercer miembro actuase de árbitro. A la terminación de la vista se concedió a las partes hasta el 14 de mayo para someter escritos adicionales en apoyo de sus contenciones si así lo deseaban. De los autos del caso y del laudo no se desprende categóricamente si lo hicieron.

Con fecha de 12 de junio de 1957 el tercer miembro emitió por escrito su laudo. En él hace una síntesis de las posiciones del patrono y de la unión, hace su propio análisis del asunto, declara probados unos hechos y formula su decisión. El árbitro declaró probados los siguientes hechos:

"1. Don Domingo Rivera Adorno comenzó a trabajar para la Autoridad de Tierras de P. R. (Central Plazuela) en su capacidad de ayudante azucarero en el año 1951.

2. Don Domingo Rivera Adorno pasó a ocupar el cargo de primer azucarero de la Central Plazuela el año 1954.

3. La Autoridad de Tierras de P. R. estableció el 23 de septiembre de 1954 su política (policy) de hacer que se acojan al retiro por vejez aquellos empleados que cumplan 65 años de edad, y que estén cubiertos por la Ley de Seguridad Social Federal.

4. Don Domingo Rivera Adorno tiene actualmente más de 70 años de edad, no goza de buena salud, ni está físicamente capacitado para desempeñar el puesto de azucarero.

5. Don Domingo Rivera Adorno se acogió voluntariamente a los beneficios del Seguro Social Federal a fines de 1956, y está gozando actualmente de dichos beneficios.

6. La Autoridad de Tierras de P. R. (Central Plazuela) no contrató los servicios de Don Domingo Rivera Adorno como azucarero para la zafra azucarera de 1957."

En 13 de septiembre de 1957, a los tres meses de rendido el laudo, Domingo Rivera Adorno radicó una querella contra el patrono en el Tribunal Superior alegando que había sido despedido de su trabajo en violación del convenio colectivo y solicitando se ordene al patrono a pagarle $8,700 por concepto de salarios correspondientes a las zafras de 1957, 1958 y 1959. El patrono contestó la querella negando el despido ilegal y aduciendo como defensas especiales que la querella no procede por haber sido la cuestión resuelta por arbitraje a tenor con el convenio colectivo, que el laudo de arbitraje es obligatorio para las partes y el querellante viene obligado a acatarlo y que por razón de dicho laudo arbitral el querellante está impedido de interponer la presente acción. En 26 de ese mismo mes de septiembre el patrono radicó una Solicitud Argumentada de Sentencia Sumaria solicitando se declarase sin lugar la querella y en 18 de octubre siguiente el querellante radicó un Escrito de Oposición a la Moción Solicitando Sentencia Sumaria acompañando dicho escrito con dos declaraciones juradas. Vistas las alegaciones, los escritos radicados por ambas partes, las declaraciones juradas, el convenio colectivo y el laudo arbitral, el Tribunal Superior, Sala de San Juan, declaró con lugar la moción de sentencia sumaria y sin lugar la querella que originó este caso. Para que revisemos la sentencia del Tribunal Superior recurre ante nos el querellante. En el curso de esta opinión mencionaremos y discutiremos los errores que señala.

 Como primer error plantea que no hubo sumisión voluntaria del querellante al arbitraje. Sostiene que el arbi-

traje celebrado entre la unión y el patrono no lo cubre porque él personalmente no se sometió y porque están en controversia derechos privados del querellante y no derechos de la unión.

No estamos de acuerdo. Sostener la posición del querellante, no sólo sería incorrecto sino que equivaldría a poco menos que producir el caos en la contratación colectiva obrero-patronal. Si bien son derechos privados los que reclama el querellante, son derechos que surgen de un contrato—el convenio colectivo—y en dicho contrato se pactó, como hemos visto, la manera de dirimir las controversias que surgiesen durante la vigencia del contrato y relacionadas con el mismo. El querellante no cuestiona, y por el contrario da por válido el convenio colectivo celebrado entre el patrono y la unión. En ese convenio es que basa los derechos que reclama—los derechos a su empleo y a los salarios. Parte de ese mismo contrato es la cláusula que crea el Comité de Quejas y Agravios y que provee para un tercer miembro cuya decisión "será final y obligatoria para las partes." No puede el querellante pretender beneficiarse de unas cláusulas del convenio y rechazar otras; no puede negociar colectivamente e individualmente a la vez. (¹)

■ Dado un convenio colectivo válido, el mismo obliga a la unión y a sus miembros individualmente así como también obliga al patrono. Tampoco podría el patrono insistir en negociar individualmente con cada empleado por separado frente a la demanda de negociar colectivamente que le hiciese una unión debidamente certificada. (²)

■ Cuando las partes firman un contrato de esta naturaleza sustituyen al árbitro por las cortes para la determina-

---

(¹) El Derecho reconoce los supuestos básicos de la vida civilizada. Uno de esos supuestos, que se ha convertido en norma jurídica, consiste en que los hombres han de cumplir sus compromisos. Véase "The Task of Law" en Roscoe Pound, *Social Control Through Law*, Yale University Press, 1942, pág. 63 y sigtes.

(²) Para una exposición de este principio véase Central Río Llano y Asociación de Azucareros Profesionales, I Decisiones de la Junta de Relaciones del Trabajo de P. R., 76, 81. (1947).

ción de todas las cuestiones de hecho y de derecho sustantivo y renuncian al derecho a litigar tales cuestiones ante los tribunales. *Junta de Relaciones del Trabajo* v. *N.Y. & P.R. Steamship Co.*, 69 D.P.R. 782, 800 (1949). En ese caso, en la página 807 dijimos "No hemos permitido a la compañía asumir dos posiciones. Habiendo voluntariamente convenido en arbitrar, no puede ahora relitigar ante nos las cuestiones resueltas por el árbitro. La misma regla se aplica a la unión." Corresponde añadir ahora que la misma regla cubre a los miembros de la unión; de otra forma sería ilusoria la justicia que dicha regla intenta hacer.

El reconocimiento de que los convenios colectivos obligan igualmente a los contratantes fomenta un mayor sentido de responsabilidad en las partes contratantes, lo que a su vez propicia la paz industrial. *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448, 1 L. ed. 2d. 972, 979, (1957), seguido en *General Electric Co.* v. *Local 205, United Electrical Radio and Machine Workers of America*, 353 U. S. 547, 1 L. ed.2d 1028 (1957), y en *Goodall-Sanford* v. *United Textile Workers of America*, 353 U. S. 550, 1 L. ed. 1031 (1957). En estos casos se trataba precisamente de poner en vigor cláusulas de arbitraje.

■ Discutiremos conjuntamente los errores segundo y tercero que se señalan porque están íntimamente relacionados. Como segundo error se señala que erró el tribunal *a quo* al dictar sentencia sin considerar los méritos de las impugnaciones del laudo formulados por el querellante. Los motivos de impugnación son la alegada falta de sumisión, falta de debido procedimiento de ley, ser el laudo contrario a derecho, porque el mismo revela pasión y prejuicio contra el querellante y porque éste tiene derecho a la suma reclamada. Razones sustancialmente iguales se aducen para fundamentar el tercer error que consiste en alegar que el tribunal *a quo* erró al dictar sentencia sobre la validez del laudo, siendo éste nulo por las razones antes apuntadas.

Nos basamos en lo expresado anteriormente al discutir el primer error para determinar que hubo sumisión válida. No encontramos tampoco falta de debido procedimiento de ley que anule el laudo. De lo antes relatado se desprende que hubo debida notificación y audiencia. La unión y el patrono estuvieron representados en la vista del caso (la unión por su presidente) y además se hicieron esfuerzos más allá de lo razonable para conseguir la asistencia personal en la vista del aquí apelante y de su abogado, quienes renunciaron voluntariamente a estar presentes.

No hay en los procedimientos ni en la conducta del árbitro ninguno de los errores que pueden producir la nulidad del laudo. (³) Véase *Junta de Relaciones del Trabajo de P. R.* v. *Orange Crush of P. R., Inc.,* 80 D.P.R. 292, 295 (1958) y *Junta de Relaciones del Trabajo de P. R.* v. *N. Y. & P. R. S. S. Co.,* supra, pág. 800 (⁴)

■ En cuanto a la alegación de ser el laudo contrario a derecho, es doctrina establecida que un laudo de arbitraje, en ausencia de alguna limitación en el acuerdo de arbitrar, no puede dejarse sin efecto debido a errores de criterio bien sean éstos de hecho o de derecho. *Junta de Relaciones del Trabajo* v. *Orange Crush,* supra, pág. 295; *Junta de Relaciones del Trabajo* v. *Soc. Mario Mercado e Hijos,* 74 D.P.R. 403, 408 (1953) ; *Junta de Relaciones del Trabajo* v. *N.Y. & P.R. S.S. Co.,* supra, pág. 800 y 801-802. No existe en el acuerdo de arbitrar en este caso limitación de esa naturaleza.

Está implícito en lo antes dicho sobre la ausencia de error que anule el laudo que no vemos pasión o prejuicio en el laudo contra el querellante. Y en cuanto al último motivo mencionado en el sentido de que el querellante tiene derecho a la

---

(³) Son éstos: fraude, conducta impropia, falta del debido procedimiento en la celebración de la vista, violación de la política pública, falta de jurisdicción y dejar de resolver todas las cuestiones sujetas a controversia.

(⁴) Véase también Sarah Torres Peralta, "The Regulation of the Field of Labor Relations in the Commonwealth of Puerto Rico", 18 Revista del Colegio de Abogados de Puerto Rico, 117, 335-346.

suma reclamada, debemos decir que eso sería secuela de un despido ilegal pero, como vimos, el árbitro determinó que el despido fue justificado. Por las razones ya expuestas no creemos que debemos variar esa determinación.

El cuarto y último error repite la alegación sobre el derecho a los salarios que acabamos de mencionar y que ya hemos considerado. No puede relitigarse lo que se arbitró válidamente. Véanse arts. 1715, 1719 y 1720 del Código Civil, 31 *L.P.R.A.*, secs. 4827, 4841 y 4842.

*Se confirmará la sentencia del Tribunal Superior.*