BUENA VISTA DAIRY, INC., peticionaria, *v.* JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, demandada.

Números: JRT-65-8, JRT-65-9        Resueltos: 2 de junio de 1967

*Sarah Torres Peralta* y *Ginoris Vizcarra,* abogados de la peticionaria; *J. B. Fernández Badillo, Procurador General, Luis M. Rivera Pérez* y *Marta Ramírez de Vera,* abogados de la demandada.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La cuestión planteada en estos recursos es si el patrono querellado incurrió o no en la práctica ilícita de trabajo que consiste en violación de un convenio colectivo. (¹)

El convenio colectivo vigente a la fecha en que surgió esta controversia creaba en su Art. VI un Comité de Quejas y Agravios para la solución de las disputas que surgiesen durante la administración de dicho convenio. El Comité estaba compuesto por dos miembros representantes del patrono y dos por la Unión. Por estar directamente relacionados con

---

(¹) El Art. 8(1)(f) de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 69(1)(f), declara práctica ilícita de trabajo el que un patrono viole los términos de un convenio colectivo.

esta controversia citaremos *verbatim* los siguientes inciso de dicho Art. VI:

"4. El trabajador o grupo de trabajadores afectados, presentará la querella a la UNIÓN, quien tratará de resolver el problema con el patrono. Si la querella no se resolviera satisfactoriamente dentro de los siguientes cinco días, la misma se someterá al Comité de Quejas y Agravios.

Si el Comité de Quejas y Agravios no llegase a un acuerdo satisfactorio para ambas partes dentro de diez (10) días desde la fecha en que haya sido notificado, el caso será sometido a un árbitro, que será nombrado por el Negociado de Conciliación y Arbitraje del Departamento del Trabajo de Puerto Rico. Nada de lo dispuesto en este Artículo impedirá que un trabajador o grupo de trabajadores trate de arreglar personalmente con el PATRONO cualquier problema que surja.

5. El término para someter un asunto al árbitro conforme a este artículo será de diez (10) días, desde vencido el Término fijado en el inciso (4) precedente y dicho término será de carácter jurisdiccional."

Radicado un cargo por la United Steelworkers of America, AFL-CIO, en adelante denominada la Unión, ante la Junta de Relaciones del Trabajo de Puerto Rico, ésta expidió la querella en 20 de octubre de 1964.

Se celebró la correspondiente vista ante el Oficial Examinador de la Junta y ésta expidió su informe en 27 de mayo de 1965. El Oficial Examinador concluyó que la querellada no había violado el convenio colectivo y recomendó a la Junta que desestimase la querella presentada en este caso. Mediante su decisión y orden de 23 de junio de 1965 la Junta concluyó que la querellada había incurrido en una práctica ilícita de trabajo consistente en violar los términos del convenio colectivo, al negarse a concurrir al Comité de Quejas y Agravios para dilucidar la cuestión relativa al cese o despido, según fuere el caso, del empleado Juan Paín Vargas.

En el recurso J.R.T. 65-9 la Junta solicita de este Tribunal que ponga en vigor su orden y en el recurso J.R.T. 65-8 la querellada nos solicita que la dejemos sin efecto. (²)

El problema ante nosotros se reduce a decidir si fue correcta la determinación del Oficial Examinador en el sentido de que la Unión no siguió el procedimiento establecido en el Art. VI del convenio colectivo o si por el contrario es correcta la posición asumida por la Junta en el sentido de que la querellada rehusó concurrir al Comité de Quejas y Agravios, impidiendo así que el Comité se reuniese para considerar la controversia que originó este caso.

Los hechos pueden resumirse en la forma siguiente. Paín cesó en su trabajo el 14 de noviembre de 1963. "Inmediatamente" el empleado se comunicó con la Unión y el representante de ésta, Sr. Cintrón, se comunicó con la querellada. (³) La posición de la querellada es que Paín había abandonado el trabajo y rehusó reponerlo.

Esta primera conversación entre el representante de la Unión y el gerente de la querellada, tuvo lugar el 14 ó el 15 de noviembre de 1963. Desde esa fecha hasta el 7 de enero de 1964 no ocurrió nada sobre el particular. Fue el 7 de enero de 1964, 53 días después de la negativa de la querellada a reponer a Paín, que el representante de la Unión se entrevistó de nuevo con el gerente de la querellada. La posición de la querellada fue la misma. Rehusó entrar en arreglo alguno por entender que Paín había abandonado el trabajo. Ante esa

---

(²) Vienen a nos, respectivamente, vía 29 L.P.R.A. sec. 70(2)(a) e *ibid.* 70(2)(b).

(³) No está claro en los autos si esta gestión se hizo el mismo día 14 de noviembre o al día siguiente. El patrono querellado nos dice en su petición que el obrero cesó el día 14 de noviembre y que "inmediatamente" la Unión demandó su re-empleo. En sus conclusiones de hecho el Oficial Examinador dice que el obrero planteó el asunto "de inmediato." En la vista ante el árbitro el patrono querellado, a través de su representación legal, expresa "estamos de acuerdo que el último día de trabajo fue el 14 de noviembre de 1963 y cualquier incidente que hubiese ocurrido, ocurrió el 15 de noviembre de 1963." (Récord, Vista de Arbitraje, pág. 2.)

situación la Unión pide al Departamento del Trabajo la designación de un árbitro. El árbitro es designado y éste celebra una vista en 19 de mayo de 1964. La cuestión sometida al árbitro por las partes fue la siguiente: "Determinar si el árbitro tiene o no jurisdicción para entender en los méritos de este caso." (Vista de Arbitraje, pág. 8.)

La decisión del árbitro fue la siguiente:

"Toda vez que no se cumplió con el Párrafo 4 del Artículo VI del convenio vigente entre las partes en este caso, ya que la querella relacionada con el señor Juan Paín Vargas que se originó el 14 de noviembre de 1963 no fue sometida a un Comité de Quejas y Agravios como lo dispone el convenio, se determina que el árbitro no tiene jurisdicción para entender en el caso del trabajador Juan Paín Vargas."

Fue en 21 de mayo de 1964, luego del procedimiento de arbitraje solicitado por la Unión, que ésta solicita que se reúna el Comité de Quejas y Agravios. La querellada rehusó someter el asunto en esa fecha al Comité. En 31 de agosto de 1964 la Unión volvió a solicitar una reunión del Comité a lo cual volvió a oponerse la querellada. La Unión presentó el cargo en la Junta contra la querellada en 5 de junio de 1964 y en 20 de octubre de ese año la Junta expidió la querella.

Debemos regresar al Art. VI del convenio colectivo en donde se crea el Comité de Quejas y Agravios y se dispone el procedimiento que ha de seguirse cuando surge una disputa obrera. Nos remitimos ahora a los párrafos números 4 y 5 de dicho Art. VI que dejamos transcritos anteriormente. El párrafo 4 dispone que, el trabajador afectado "presentará la querella a la Unión, quién tratará de resolver el problema con el patrono. Si la querella no se resolviera satisfactoriamente dentro de los siguientes cinco días, la misma se someterá al Comité de Quejas y Agravios."

Inmediatamente continúa disponiendo dicho párrafo cuarto que "Si el Comité de Quejas y Agravios no llegase a

un acuerdo satisfactorio para ambas partes dentro de diez (10) días desde la fecha en que haya sido notificado, el caso será sometido a un árbitro, que será nombrado por el Negociado de Conciliación y Arbitraje del Departamento del Trabajo de Puerto Rico." El párrafo número 5 del citado Art. VI del convenio dispone que vencidos los diez días que tiene el Comité de Quejas y Agravios para resolver el asunto, hay un término de diez días más para someter el asunto al árbitro.

Los hechos no controvertidos demuestran que el empleado notificó a la Unión y que la Unión se comunicó con la querellada. También demuestran que pasaron con exceso los cinco días que provee el citado párrafo número 4 para resolver o tratar de resolver la disputa con el patrono. Pasados esos 5 días correspondía a la Unión solicitar formalmente la reunión del Comité de Quejas y Agravios y someterle el asunto.

El Art. VI del convenio tiene el defecto de que en su párrafo Núm. 4 no provee un término para someterle los asuntos al Comité de Quejas y Agravios cuando ha fracasado la tentativa de resolver el problema con el patrono. Nótese que para esta tentativa de resolver el problema con el patrono el párrafo Núm. 4 de dicho Art. VI da un término de 5 días. Para el caso de que la tentativa de resolver el problema con el patrono fracase, como ocurrió en este caso, el Art. VI no provee un término durante el cual se someterá el asunto al Comité de Quejas y Agravios. Solamente dice que el asunto se someterá a dicho Comité. En ausencia de una disposición expresa del convenio limitando a un número preciso de días dicho término, nos vemos forzados a concluir que dicho término tiene que ser uno razonable. Sería irrazonable para con los obreros presumir que ese término es de solamente unas horas pero también sería irrazonable para con el patrono presumir que ese término es de varios meses. No conduce a la paz industrial—uno de los objetivos de la Ley de Relaciones del

Trabajo y de los procedimientos de negociación colectiva y arbitraje—el que las controversias entre los obreros y los patronos queden pendientes de someterse a los Comités de Quejas y Agravios por períodos largos e indefinidos.

En este caso la Unión inició sus conversaciones con el patrono el 15 de noviembre de 1963. Aun si exceptuamos el sábado 16 y el domingo 17, venció el 22 de ese mes y año el término de 5 días que provee el párrafo Núm. 4 del Art. VI para "tratar de resolver el problema con el patrono." Lo que correspondía entonces hacer era llevar el asunto al Comité de Quejas y Agravios. Como, según hemos indicado, el convenio no dispone un término para someter el asunto al Comité, tenemos que concluir como cuestión práctica que dicho término tiene que ser uno razonable.

■ Fue en 21 de mayo de 1964, luego de que el árbitro se declaró sin jurisdicción, que la Unión solicitó la reunión del Comité de Quejas y Agravios. Como, según vimos, el término para discutir el asunto con el patrono había expirado el 22 de noviembre de 1963, desde esa fecha a la fecha en que la Unión solicitó la reunión del Comité de Quejas y Agravios (21 mayo 1964) transcurrieron seis meses menos un día. Salvo pacto en contrario, seis meses es un período demasiado largo para recurrir de la determinación unilateral del patrono al Comité de Quejas y Agravios. No puede considerarse razonable.

Nos hacemos cargo de que en la vista ante el árbitro el representante de la Unión, Sr. Cintrón, expresó que él creía que se cumplieron sustancialmente los pasos que el convenio indica y expresó que la Unión no sometió el caso al Comité de Quejas y Agravios porque la conducta de la querellada hizo imposible que dicho paso se llevase a cabo. El error de Cintrón fue creer que la decisión unilateral del patrono terminaba el asunto y que su próximo paso era recurrir al árbitro. Hizo caso omiso del Comité de Quejas y Agravios. Quiso pasar

el asunto al Departamento del Trabajo sin antes darle una oportunidad al proceso de discusión y negociación que hace posible el Comité de Quejas y Agravios. ([4])

En la vista de arbitraje Colón, el gerente de la querellada, y persona con quien Cintrón había estado en comunicación sobre este asunto, declaró sustancialmente que él (Colón) le contestó a Cintrón que Paín había abandonado el trabajo y que no lo repondrían en su puesto. De esa determinación del patrono era que había que recurrir al Comité de Quejas y Agravios, no al árbitro.

■ El récord demuestra que la posición de la querellada en la vista de arbitraje fue que la querellada no repondría a Paín en su trabajo pero que si se le hubiese solicitado la reunión del Comité de Quejas y Agravios hubiese concurrido a la misma. Independientemente de si esa posición que adoptó el gerente de la querellada en la vista de arbitraje era sincera o no, la realidad es que la Unión no fue diligente al no someter formalmente al Comité de Quejas y Agravios la cuestión luego de fracasada la tentativa de arreglar el asunto con el patrono, según lo dispone el Art. VI del convenio. Durante esas conversaciones iniciales entre la Unión y el patrono la posición del patrono fue terminante y explícita. Rehusaba reponer a Paín en su trabajo. Ante esa clara negativa correspondía a la Unión someter diligentemente el asunto al Comité de Quejas y Agravios. Si allí no tenía éxito entonces es que, de acuerdo con el citado Art. VI del convenio, correspondía solicitar al Departamento del Trabajo la designación del árbitro. La Unión hizo caso omiso del procedimiento prescrito en el convenio, y no fue hasta seis meses después, cuando fallaron esos otros esfuerzos que quiso acudir al Comité de Quejas

---

([4]) El convenio dispone que si el Comité de Quejas y Agravios no llegase a un acuerdo satisfactorio para ambas partes dentro de 10 días, el caso le será sometido a un árbitro, el cual será nombrado por el Departamento del Trabajo de Puerto Rico. Art. VI(4).

y Agravios. Según no le hubiésemos permitido al patrono esa desviación crasa del procedimiento pactado en el convenio colectivo tampoco se la podemos permitir a la Unión.

■ Nuestro deber es, en general, impartir justicia; y en estos casos en particular, debemos impartirle a la negociación colectiva obrero-patronal y a los procedimientos producidos por ella, una seriedad y ecuanimidad que los haga respetables y respetados. Creemos que de este modo contribuimos a la paz industrial pues impartiéndoles seriedad y obligatoriedad al producto de la negociación colectiva creamos una medida de certeza en el derecho laboral que es deseable. Esa certeza, creemos, ha de inspirar confianza a las partes contratantes en que lo que contratan tendrá realmente fuerza de ley entre ellos. Eso, creemos, es deseable para ambas partes y, como dijimos, a la vez tiende a propiciar la paz industrial. *Pérez* v. *Autoridad de Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963); *Rivera Adorno* v. *Autoridad de Tierras*, 83 D.P.R. 258, 265 (1961); *Textile Workers Union* v. *Lincoln Mills*, 353 U.S. 448 (1957); seguido en *General Electric Co.* v. *Local 205, United Electrical Radio and Machine Workers of America*, 353 U.S. 547 (1957), y en *Goodall-Sanford* v. *United Textile Workers of America*, 353 U.S. 550 (1957).

■ Es parte consustancial de la problemática del derecho vivo las necesidades conflictivas de seguridad y certeza por un lado, y por el otro, de flexibilidad y posibilidades de adaptación a la realidad cambiante. Ambas cualidades—certeza y flexibilidad—son deseables en el derecho. Debe ser fácil advertir la dificultad que para armonizarlas plantean al jurista y al juez, especialmente a este último que es quién tiene que bregar con el problema no sólo en el campo teórico sino también en el campo eminentemente práctico de producir soluciones para casos reales y concretos. Cae sobre los tribunales la responsabilidad de mantener el debido balance entre ambas exigencias antagónicas mencionadas. Tenemos, con fre-

cuencia, que ensayar a hacer una síntesis de esa antítesis. En este terreno no hay soluciones perfectas. Lo más que podemos hacer es resolver en la forma que mejor sirve a los intereses en conflicto, compatible todo ello con la ley y la justicia. Los intereses en conflicto no son, claro está, solamente los representados por los litigantes; dicho término incluye además la necesidad de un ordenamiento jurídico racional, el interés general y, como hemos sugerido, el valor moral y social que llamamos justicia. (5)

A pesar de que simpatizamos con las aseveraciones que hace la Junta en su decisión sobre los propósitos de los Comités de Quejas y Agravios y de la institución del arbitraje y sobre las actitudes que deben prevalecer para que esos procedimientos y esas instituciones puedan funcionar justa y adecuadamente, dados los hechos de este caso, tenemos que concluir que la querellada no incurrió en la práctica ilícita que se le imputó.

*Se dejará sin efecto la Decisión y Orden Núm. 392 dictada por la Junta de Relaciones del Trabajo en este caso.*

---

(5) Pound, *Interpretations of Legal History* (1923) pág. 1; Kessler, "Theoretic Bases of Law" en *Landmarks of Law*, ed. por Hensen (1960). Beacon Paperback, 1966, pág. 13–14; W. Friedmann, *Legal Theory*, 4ta. ed. (1960) pág. 32; Castán, *Teoría de la Aplicación e Investigación del Derecho* (1947) pág. 356; Cardozo, *The Nature of the Judicial Process* (1921) Lecture III; Paton, *Jurisprudence*, 2da. ed. (1951) pág. 169.