# 2002 DTA 140

### TRIBUNAL DEL CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL I, PANEL IV DE SAN JUAN

HERMANDAD DE EMPLEADOS DE OFICINA, COMERCIO
Y RAMAS ANEXAS DE PUERTO RICO, ETC.
Peticionaria

v.

AUTORIDAD METROPOLITANA DE AUTOBUSES
Recurrida

Núm. KLCE-01-00782

San Juan, Puerto Rico, a 12 de septiembre de 2002

Panel integrado por su Presidente, el Juez Gierbolini, el Juez Cordero y el
Juez Rodríguez Muñiz

Gilberto Gierbolini, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El 10 de julio de 2001, la Hermandad de Empleados de Oficina, Comercio y Ramas Anexas de Puerto Rico (en adelante Hermandad) presentó la Petición de *Certiorari* y nos solicitó la revocación de la Resolución emitida el 21 de mayo de 2001, notificada el 14 de junio de 2001, por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante dicha resolución, el Tribunal de Primera Instancia revocó un Laudo de Arbitraje emitido el 26 de septiembre de 2000, notificado el 28 de septiembre de 2000, por un Arbitro del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos (en adelante Negociado).

Por los fundamentos que expondremos, **EXPEDIMOS** la Petición de *Certiorari* solicitada y **REVOCAMOS** la Resolución recurrida.

### I

El 29 de junio de 1998, el Sr. Armando Bermúdez Torres, entonces Presidente de la Hermandad, envió una carta al Presidente de la Autoridad Metropolitana de Autobuses (en adelante AMA), Sr. Jorge Rivera Rodríguez, en la cual solicitó la reasignación de las escalas salariales de los puestos de Contadores I y II. Dicha comunicación nunca fue contestada por la AMA y ésta tampoco notificó a la Hermandad si tomó alguna decisión al respecto.

En el mes de agosto de 1998, el señor Bermúdez Torres renunció a su puesto en la Hermandad y el Sr. Jaime Aldebol Agosto fue electo como nuevo Presidente de la Hermandad. Posteriormente, la AMA notificó a la Hermandad una propuesta para enmendar y prorrogar el Convenio Colectivo habido entre las partes. Dicha propuesta ofrecía aumentos salariales de $80.00 al 1 de enero de 2001 y otro por la misma cantidad al 1 de enero de 2002, así como la concesión de un día libre por concepto de día de cumpleaños, una aportación de $12.00 mensuales por empleado para su seguro de vida y otros beneficios adicionales. Cabe señalar que nada fue dispuesto con relación a la revisión de las escalas salariales para los contadores.

El 3 de noviembre de 1998, la Hermandad presentó una contrapropuesta y, entre otras cosas, solicitó dos aumentos salariales de $130.00, uno de ellos efectivo al 1 de enero de 2001 y el otro al 1 de enero de 2002, y un tercer aumento salarial de $110.00 para el 1 de enero de 2003. La Hermandad también propuso integrar al Convenio Colectivo la Junta de Promoción y Recalificación, y en lo pertinente a la revisión de escalas salariales, solicitó la revisión de todas las escalas salariales incluyendo las de Contador I y II.

El 13 de noviembre de 1998, la Hermandad envió una carta al Presidente de la AMA y solicitó la reconsideración de la propuesta de revisión de la escala salarial de un empleado en particular que había sido denegada previamente, y a su vez, solicitó la reconsideración de las escalas salariales de otros puestos.

El 20 de noviembre de 1998, la AMA informó a la Hermandad que reiteraba su propuesta original para enmendar y prorrogar el convenio colectivo, la cual no incluía la revisión de escalas salariales. Por lo tanto, el 24 de noviembre de 1998 y el 9 de marzo de 1999, la Hermandad presentó a la AMA dos nuevas contrapropuestas en las que ajustó los aumentos salariales y reafirmó su solicitud de revisión de todas las escalas salariales.

Así las cosas, el 28 de junio de 1999, la AMA emitió la Resolución Administrativa Interna Número 99-03 (en adelante Resolución 99-03) mediante la cual reubicó las escalas de los puestos de Contador I y II a las escalas X y XI, respectivamente, tal como lo había solicitado el anterior Presidente de la Hermandad mediante la carta del 28 de junio de 1998. No obstante, dicha resolución no fue notificada a la Hermandad, por lo que, el Presidente de la Hermandad solicitó a la AMA copia de la misma.

El 29 de junio de 1999, ▮ la Hermandad envió una carta a la AMA en la cual hizo referencia a la solicitud de reclasificación de las escalas salariales anteriormente hecha e indicó, además, que desconocía porqué la AMA rehusaba reclasificar las escalas salariales y estaba inclinada a ofrecer una revisión salarial de forma individual a los empleados que ocupaban los puestos de Contador I y II. Particularmente, la Hermandad señaló que: *"La Autoridad tiene que negociar las condiciones de trabajo como las revisiones de escala, que son beneficios económicos con la organización no en forma individual o grupo de oficina..."*.

El 30 de junio de 1999, la AMA generó varias *"Acciones Sobre Personal"* mediante las cuales ajustó el salario de tres contadores como consecuencia del cambio de escalas de sus plazas conforme la Resolución 99-03. Según el testimonio de una testigo de la Hermandad, la AMA citó a los contadores a una reunión en la oficina del Presidente, en la cual también estaba la Vicepresidenta y el Subdirector de Administración, para informarles sobre los cambios en sus salarios. Cabe señalar que la AMA no invitó a dicha reunión a ningún oficial de la Hermandad.

Luego de que la AMA revisara las escalas salariales de los contadores, el 1 de julio de 1999, la Hermandad solicitó una reunión con el Comité de Quejas y Agravios para discutir lo que ella entendía que era una violación al: (i) Artículo II del Convenio Colectivo por ser la Hermandad la representante exclusiva de los empleados; y (ii) a la Ley de Relaciones del Trabajo, Ley Número 130 del 8 de mayo de 1945, Artículos 5 (1) y 8 (f), 29 L.P. R.A. Secciones 66 (1) y 69 (1) (f). ▮

Según lo establecido en el Artículo XXIX del Convenio Colectivo, el Comité de Quejas y Agravios celebró una reunión en la cual ambas partes estuvieron representadas. Como la Hermandad y la AMA no llegaron a un acuerdo, éstas solicitaron al Negociado que designara un Arbitro para resolver la controversia suscitada entre ellas. Ante dicho árbitro, la Hermandad y la AMA llegaron al siguiente acuerdo de sumisión:

*"Determinar si la AMA viola o no los términos del Convenio Colectivo al concederle un ajuste salarial a los Contadores incluidos en la unidad apropiada y al cambiar sus plazas de escala sin discutirlo y negociarlo con la Hermandad.*

*De determinarse que la AMA violó los términos del Convenio Colectivo al concederle un ajuste salarial a los Contadores incluidos en la escala sin discutirlo y negociarlo con la Hermandad, que el Comité de Quejas y Agravios provea el remedio adecuado."*

Aunque la AMA estuvo de acuerdo con la sumisión, ésta planteó que la querella no era arbitrable procesalmente porque la Hermandad no había cumplido con las disposiciones sobre quejas y agravios establecidas por los Incisos A y C del Artículo XXIX del Convenio Colectivo. Los mismos establecen que los representantes de la Hermandad y la AMA deben celebrar una reunión y que, de surgir algún *impasse,* deben presentar una querella al Comité de Quejas y Agravios dentro de los próximos 10 días.

La AMA argumentó que la Hermandad no la había citado a una reunión antes de presentar la querella, que dicha querella no había sido presentada dentro del término de 10 establecido por el Artículo XXIX del Convenio Colectivo y que por lo tanto, procedía la desestimación de la misma. A tales efectos, la AMA presentó como prueba una carta del 18 de noviembre de 1997 en la cual informó a la Hermandad que debía seguir las disposiciones del Convenio Colectivo en cuanto a la presentación de querellas.

El árbitro determinó que la referida carta, que data de un año y 10 meses con respecto a la querella en controversia, no demostraba que la querella había sido presentada fuera del término establecido en el Convenio Colectivo y que, por ende, no procedía desestimarla. En cuanto al planteamiento sobre violación al Convenio Colectivo por parte de la AMA, el árbitro determinó que la AMA había actuado contrario a lo establecido en el mismo porque ella había negociado los cambios de salarios sin antes negociarlos con la Hermandad. Por lo tanto, el árbitro emitió un laudo de arbitraje a favor de la Hermandad.

Al emitir el laudo, el árbitro concluyó que desde el mes de junio de 1998, la Hermandad solicitó a la AMA una revisión de las escalas salariales para los Contadores I y II y no fue hasta un año después que la AMA aprobó la misma sin haber celebrado una reunión con la Hermandad o haber informado a ésta de dicha aprobación.

El 30 de octubre de 2000, la AMA solicitó al Tribunal de Primera Instancia que revocara y dejara sin efecto el laudo emitido por el árbitro porque el mismo era contrario a derecho y a la política pública referente a las negociaciones obrero-patronales. El 1 de diciembre de 2000, la Hermandad presentó su Alegato y alegó que *"lo que la Hermandad trata de impedir es que el Patrono se envuelva en una serie de contratos o concesiones individuales, grupales y hasta colectivas con los empleados sin negociarlo con la Hermandad como su representante exclusiva."*

Luego de evaluar los escritos presentados por las partes y los testimonios vertidos en la vista celebrada, el 21 de mayo de 2001, notificada el 14 de junio de 2001, el Tribunal de Primera Instancia emitió Resolución y revocó el laudo emitido por el árbitro. Como cuestión de hecho, Instancia determinó que tras la solicitud del 29 de junio de 1998 sobre cambios en las escalas salariales, la AMA había concedido a los empleados que ocupaban dichos puestos lo solicitado por la Hermandad. ■

El Tribunal de Primera Instancia también determinó que el árbitro erró al concluir que la AMA no había negociado dicho cambio con la Hermandad y que esa conclusión era contraria a derecho porque iba en contra de la política pública de fomentar la negociación en las relaciones obrero-patronales. Además, el Tribunal de Primera Instancia determinó que *"debido a que la solicitud hecha por la unión de un ajuste salarial a los Contadores incluidos en la unidad apropiada y el cambiar sus planes de escala, fue aceptada en su totalidad desde un principio por la AMA, llevar a cabo la negociación en torno a lo solicitado se tornaba innecesario."*

No conforme, el 10 de julio de 2001, la Hermandad compareció ante este Tribunal mediante la Petición de *Certiorari* y nos solicitó la revocación de la resolución emitida por el Tribunal de Primera Instancia. En síntesis, la Hermandad alegó que Instancia erró al determinar que la AMA no había violado el Convenio Colectivo, que la AMA había negociado con la Hermandad los cambios de escala salarial de los contadores y que la reasignación de los puestos de contadores a unas escalas superiores era en cumplimiento de un acuerdo previamente establecido con la Hermandad.

La Hermandad también alegó que *"la violación a la política pública radica en la conducta de la AMA de ignorar por completo a la Hermandad como representante exclusiva de los miembros de la Unidad Apropiada y sentarse a negociar esos cambios individualmente con los trabajadores, aunque los referidos cambios fueron beneficiosos para esos trabajadores individualmente."*

El 31 de julio de 2001, la AMA presentó su Oposición al *certiorari* solicitado por la Hermandad y solicitó la confirmación de la resolución recurrida. La AMA alegó que el laudo emitido por el árbitro era contrario a derecho y que el confirmar el mismo es *"querer amparar dicha decisión al hecho de que el cambio fue puesto en vigor dentro de un año fiscal en el cual había ocurrido un cambio de presidencia dentro de la H.E.O., y no significa que la A.M.A. no tenga que honrar los acuerdos preestablecidos con la propia Unión, máxime cuando repercuten en beneficio de los propios empleados unionados y fomentan la paz y tranquilidad de las relaciones obrero patronales."*

Al estar perfeccionado el recurso ante nuestra consideración, procedemos a resolver.

## II

Por un lado, el Artículo II, Sección 17, de la Constitución del Estado Libre Asociado de Puerto Rico reconoce el derecho de los trabajadores a organizarse y negociar colectivamente con sus patronos por medio de representantes de su propia y libre selección. Por otro lado, la Asamblea Legislativa de Puerto Rico ha consignado ese derecho en la Ley de Relaciones del Trabajo, *supra*. Dicha ley expresa la política pública respecto a las relaciones obrero-patronales, la cual consiste en fomentar la negociación colectiva de forma que la paz y estabilidad industrial pueda ser mantenida, *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963).

El propósito de la negociación colectiva es lograr un acuerdo entre el patrono y el portavoz de los reclamos de los empleados de éste, el cual queda pactado en un convenio colectivo. Reiteradamente, el Tribunal Supremo ha resuelto que un convenio colectivo es un contrato que, como tal, tiene fuerza de ley entre las partes, siempre que no contravenga las leyes, la moral y el orden público, *J.R.T. v. Vigilantes, Inc.*, 125 D.P.R. 581, 592 (1990); *J.R.T. v. Junta Adm. Muelle Mun. de Ponce*, 122 D.P.R. 318, 333 (1988); *A.M.A. v. J.R.T.*, 114 D.P.R. 844, 847 (1983). En consecuencia, su validez y eficacia debe ser siempre objeto del más entusiasta endoso por parte de los tribunales, *U.I.L. de Ponce v. Dest. Serrallés, Inc.*, 116 D.P.R. 348, 352 (1985).

En nuestra jurisdicción ha sido reconocido que el arbitraje es el medio más apropiado y deseable para resolver las disputas obrero-patronales que surgen de la aplicación e interpretación de los convenios colectivos. Ello es así, porque es un medio más rápido, cómodo, menos costoso y técnico que los procedimientos judiciales y, además, permite cumplir con los propósitos cardinales que persiguen nuestras leyes laborales, *J.R.T. v. Hato Rey Psychiatric Hospital*, 119 D.P.R. 62, 68 (1987); *Pagán v. Fund. Hosp. Dr. Pila*, 114 D.P.R. 224, 231 (1983); *S.I.U. de Puerto Rico v. Otis Elevator Co.*, 105 D.P.R. 832, 836 (1977); *Pérez v. Autoridad Fuentes Fluviales, supra*, página 127.

Una cláusula en un convenio colectivo que establezca el procedimiento de arbitraje como mecanismo de ajuste de controversias crea un foro sustituto a los tribunales de justicia. En consecuencia, esto representa la sustitución del juez por un árbitro, *Condado Plaza Hotel & Casino v. Asoc. de Empleados de Casinos de Puerto Rico*, ____ D.P.R. ____ (1999), **99 J.T.S. 153**, página 143; *López v. Destilería Serrallés*, 90 D.P.R. 245, 256 (1964). La autoridad del árbitro para entender en una controversia queda definida por la cláusula de arbitraje convenida, así como por el acuerdo de sumisión sometido por las partes y aquella autoridad que pueda ser conferida para confeccionar el remedio que corresponda.

En el proceso de arbitraje, la función principal del árbitro es interpretar las cláusulas de los convenios colectivos. Su interpretación no está limitada exclusivamente al contenido del convenio colectivo porque puede hacer uso de otras fuentes, siempre que éste no se aparte de la esencia del mismo. Sin embargo, la libertad de interpretación del árbitro dependerá de la claridad de las cláusulas del convenio. En ocasiones, una cláusula cuyo lenguaje parece ser claro, puede ser ambigua y la misma puede admitir interpretaciones conflictivas. Por consiguiente, el árbitro tiene flexibilidad para emitir su interpretación, *J.R.T. v. National Packing Co.*, 112 D.P.R. 162, 165-167 (1982).

En *J.R.T. v. Corporación de Crédito Agrícola*, 124 D.P.R. 846, 849-850 (1989), el Tribunal Supremo expuso lo siguiente sobre el alcance de la revisión judicial de un laudo de arbitraje:

*"La trayectoria de nuestras decisiones en materia de arbitraje obrero-patronal se caracteriza por una marcada deferencia hacia los laudos de arbitraje. En consonancia con este principio, hemos reiterado que un laudo fundamentado en la sumisión de las partes está sujeto a revisión judicial sólo si las partes convienen en que la controversia sometida al árbitro sea resuelta conforme a derecho. [Citas omitidas] En ausencia de disposición expresa a esos efectos, un laudo sólo puede ser impugnado si se demuestra la existencia de fraude, conducta impropia del árbitro, falta del debido proceso de ley, ausencia de jurisdicción, omisión en resolver todas las cuestiones en controversia que se sometieron o que el mismo resulte contrario a la política pública,"* (Citas omitidas).

De lo anterior, surge que cuando el convenio expresamente especifica que todo asunto sometido al árbitro o que determinada materia deberá ser resuelta conforme a derecho, los laudos pueden ser revisados judicialmente por errores de derecho, *J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra*, página 326; *CRUV v. Hampton Dev.*, 112 D.P.R. 59, 64 (1982); *S.I.U. de Puerto Rico v. Otis Elevator Co., supra*, página 837; *Colón Molinary v. A.A.A.*, 103 D.P.R. 143, 155 (1974); *Autoridad sobre Hogares v. Tribunal Superior*, 82 D.P.R. 344, 354 (1961).

El condicionar un laudo a que sea emitido conforme a derecho significa que *"el árbitro no puede ignorar las normas interpretativas de derecho sustantivo emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de derecho laboral, y que se reputan persuasivas las decisiones de los tribunales de primera instancia y de agencias administrativas, y laudos y escritos de reputados árbitros,"* *J.R.T. v. Hato Rey Psychiatric Hospital, supra*, página 68. Por lo tanto, *"los árbitros deben seguir las reglas de derecho y rendir sus laudos a tenor con las doctrinas legales prevalecientes. Si el convenio de arbitraje nada dice en cuanto a esto, de conformidad con la Ley Común bajo la mayoría de las leyes de arbitraje, los árbitros pueden declarar cuál es la ley y ningún laudo será anulado a causa de sus errores de derecho,"* *J.R.T. v. NY & PR S/S Co.*, 69 D.P.R. 782, 802 (1949).

En *U.I.L. de Ponce v. Dest. Serrallés, Inc., supra*, página 353, el Tribunal Supremo expresó lo siguiente en cuanto a la revisión judicial de los laudos de arbitraje:

*"El procedimiento a seguirse en el foro judicial será uno similar al utilizado cuando el tribunal, actuando como foro apelativo, revisa la corrección o incorrección de la sentencia emitida por un tribunal inferior o la decisión de un organismo administrativo. Resolver lo contrario -en otras palabras, permitir la relitigación de la controversia en un proceso civil ordinario-, constituiría "echar por la borda" la labor realizada por el árbitro; es decir, convertiría la referida labor en un ejercicio de futilidad y se desvirtuaría la naturaleza inherente del procedimiento de arbitraje laboral,"* (Escolio omitido).

Un laudo de arbitraje ocupa una posición muy similar a la de una sentencia o decreto judicial. La regla general es que el laudo de arbitraje es final e inapelable, por lo que no puede ser litigado en los tribunales lo que válidamente fue arbitrado. Ello quiere decir que los tribunales no intervendrán con el laudo emitido aun cuando quizás hubieran llegado a una conclusión diferente; máxime cuando las partes que firman un convenio colectivo en el que escogen el arbitraje para resolver sus disputas obrero-patronales, han sustituido al árbitro por las cortes. *U.G.T. v. Challenger Caribbean Corp.*, 126 D.P.R. 22, 29 (1990); *J.R.T. v. National Packing Co., supra*, página 165; *J.R.T. v. Otis Elevator Company*, 105 D.P.R. 195, 199 (1976); *J.R.T. v. NY & PR S/S Co., supra*, páginas 800-801.

Los procedimientos de arbitraje y laudos emitidos en el campo laboral gozan de una gran deferencia por parte de los tribunales debido a que ellos constituyen una herramienta ideal para fortalecer la negociación

colectiva, *J.R.T. v. Corporación de Crédito Agrícola, supra*, página 849; *J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra*, página 325; *U.I.L. de Ponce v. Dest. Serrallés, Inc., supra*, páginas 353-354; *Pagán v. Fund. Hosp. Dr. Pila, supra*, página 231. Por lo tanto, el rol de los tribunales al revisar la validez de un laudo de arbitraje bajo un convenio colectivo es verdaderamente estrecho y limitado y de clara autorrestricción o abstención judicia, *J.R.T. v. Hato Rey Psychiatric Hospital, supra*, página 67.

### III

En el presente recurso, la Hermandad alega que el Tribunal de Primera Instancia erró al revocar el laudo y determinar que la AMA no había violado el convenio colectivo y que la AMA había negociado y acordado previamente con la Hermandad los cambios en escalas salariales y reasignación de los puestos de Contador I y II. Luego de analizar el expediente de autos, así como el derecho aplicable, nos percatamos que dichos errores fueron cometidos.

Aunque la AMA concedió lo solicitado por la Hermandad al reasignar las escalas salariales de los puestos de Contador I y II, lo cierto es que dicha concesión fue realizada al año de haber sido solicitada y en ningún momento la AMA notificó a la Hermandad que su solicitud había sido considerada favorablemente. Durante el transcurso de ese año, la Hermandad y la AMA estuvieron en continuas negociaciones para enmendar y prorrogar el convenio colectivo suscrito entre ambas, y aunque la Hermandad solicitó varias veces a la AMA que revisara las escalas salariales de sus empleados, las propuestas de la AMA no incluyeron la revisión de escalas solicitada.

Según lo dispuesto en el convenio colectivo suscrito por la AMA y la Hermandad, ésta es la representante exclusiva de los empleados cobijados por el mismo. El principio de representación exclusiva tiene como propósito evitar que el patrono negocie directamente con los empleados y que tome ventaja sobre algunos de estos, quienes podrían estar sujetos a su influencia. Ello quiere decir que el patrono está impedido de perfeccionar contratos individuales que contengan condiciones de empleo diferentes a las del convenio colectivo, Demetrio Fernández & Celina Romany, *Derecho Laboral: Casos y Materiales*, San Juan, Editorial de la Universidad de Puerto Rico 1987, T. 1, página 329; *Rivera Adorno v. Autoridad de Tierras*, 83 D.P.R. 258, 264 (1961).

De lo anterior, surge que la AMA no podía negociar con los contadores individualmente las reasignaciones de sus puestos conforme a unas nuevas escalas salariales. Aunque la AMA alega que no negoció directamente con los contadores, sino que meramente les informó que sus puestos habían sido reasignados porque las escalas salariales habían sido revisadas, lo cierto es que luego de que pasara un año desde que la Hermandad solicitara a la AMA una revisión de las escalas salariales, la AMA aprobó la misma sin reunirse o informarle a la Hermandad de ello.

Por lo tanto, dado que la Hermandad es la representante exclusiva de los empleados cobijados por el convenio colectivo suscrito con la AMA, y dado que la AMA no negoció colectivamente con la Hermandad los cambios en la reasignación de las escalas salariales de los puesto de Contador I y II, resolvemos que la AMA incurrió en una práctica ilícita de trabajo al violar las disposiciones de los Incisos 1 (d) y 1 (f) del Artículo 8 de la Ley de Relaciones del Trabajo, *supra*.

### IV

En virtud de los fundamentos anteriormente expuestos, **EXPEDIMOS** la Petición de *Certiorari* solicitada y **REVOCAMOS** la Resolución recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2002 DTA 140**

**1.** A esta fecha, la Hermandad no tenía conocimiento de la Resolución 99-03 que ha había sido aprobada el día anterior.

**2.** Ley de Relaciones del Trabajo, Número 130 del 8 de mayo de 1945, Artículo 5 (1), 29 L.P.R.A. Sección 66(1): *"Los representantes designados o elegidos para contratar colectivamente por una mayoría de los empleados en una unidad apropiada para tales fines, serán los representantes exclusivos de todos los empleados en esa unidad de negociación colectiva; Disponiéndose, que cualquier empleado individual tendrá derecho a cualquier momento a presentar agravios individualmente a su patrono, Artículo 8 (1) (f), 29 L.P.R.A. Sección 69 (1) (f): "Será práctica ilícita de trabajo el que un patrono, actuando individualmente o concertadamente con otros:*

*...*

*(f) Viole los términos de un convenio colectivo, incluyendo un acuerdo en el que se compromete a aceptar un laudo de arbitraje, esté o no dicho acuerdo incluido en los términos de un convenio colectivo; Disponiéndose, sin embargo, que la Junta podrá declarar sin lugar cualquier cargo en el cual se alegue una violación de este inciso, si la unión que es parte en el contrato es culpable de una violación en curso del convenio o no ha cumplido con una orden de la Junta relativa a alguna práctica ilícita de trabajo, según lo dispone este Subcapítulo."*

**3.** El Tribunal de Primera Instancia concluyó que *"dicho cambio se hizo efectivo para el próximo año fiscal, toda vez que el presupuesto del año fiscal 1998 ya estaba establecido y no contemplaba el cambio."*