*271 Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta, a la cual se une el Juez Asociado Señor Fuster Berlingeri.
Para el trabajador, partícipe menor en los frutos de la empresa, para quien no hay liquidación de dividendos, ni beneficios, ni intereses acumulados en la digna faena de ganar con sus esfuerzos el pan que parte en la mesa con los suyos, para quien el ahorro es ilusión devorada por la estrechez, la indemnización por despido es importante evento de la justicia social debida al hombre como factor de producción. (Énfasis suplido.) Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979)
La decisión que toma hoy una mayoría de los miembros de esta Curia cierra de forma lamentable un capítulo en la vida de los empleados públicos que se han visto afectados por la privatización de distintos servicios prestados hasta hace poco por el Estado. Nuestras decisiones respecto a ellos no deben socavar la política pública a favor de la clase trabajadora puertorriqueña proclamada en nuestra legislación laboral y respaldada por nuestra jurisprudencia. Menos aún cuando ello resulta en una injusticia contra antiguos empleados públicos que ya sufren los peijuicios de perder un trabajo sobre el cual tenían un interés jurídicamente reconocido. La opinión de este Tribunal coloca a estos empleados en una situación indudablemente desventajosa, porque no sólo han perdido los beneficios que disfrutaban como empleados públicos, sino que se les niegan derechos reconocidos a los demás empleados del sector privado. Ante el sombrío precedente sentado por este Tribunal, es mi obligación disentir vigorosamente. A continuación explico mis razones.
*272 I
Desde 1930, existe en Puerto Rico una fuerte política pública laboral a favor de la protección efectiva del empleo y de los trabajadores despedidos sin justa causa o caprichosamente por sus patronos. Conforme a esta política, se adoptó en 1949 la primera Ley de la Mesada, la Ley Núm. 50 de 20 de abril de 1949, que fue sustituida por la ley vigente, la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a et seq.). Esta provee un remedio de naturaleza económica, conocido como mesada, para que los empleados así despedidos reciban una compensación por los daños que les cause su patrono con su acción injustificada. Por lo general, el patrono deberá indemnizar al empleado despedido sin justa causa con una mesada proporcional a los años de servicio rendidos para su propio establecimiento o empresa. 29 L.P.R.A. sec. 185a. Sin embargo, el Art. 6 de la Ley Núm. 80, supra, 29 L.P.R.A. see. 185f, permite transferir la responsabilidad de un patrono a otro, cuando se transfiere un establecimiento en marcha y el segundo patrono decide mantener en la nómina a los empleados del patrono anterior. La ley formula esta doctrina de la manera siguiente:
En el caso del traspaso de un negocio en marcha, si el nuevo adquirente continúa utilizando los servicios de los empleados que estaban trabajando con el anterior dueño, se les acreditará a éstos el tiempo que lleven trabajando en el negocio bajo anteriores dueños. 29 L.P.R.A. sec. 185f.
De esta forma, si el adquirente de un establecimiento que retiene a empleados del patrono anterior despide sin justa causa a alguno de estos empleados, se incluirá en el cálculo de la mesada los años que éstos trabajaron para el patrono anterior.
La Ley Núm. 80, supra, no define concretamente qué constituye un “negocio en marcha” para efectos de la mesada. La opinión mayoritaria, por su parte, le niega esta categoría a las instalaciones de salud del Gobierno adqui *273 ridas por empresas privadas mediante el esquema de privatización implementado por la Ley para Reglamentar el Proceso de Privatización de las Instalaciones de Salud Gubernamentales, Ley Núm. 190 de 5 de septiembre de 1996 (24 L.P.R.A. see. 3301 et seq.). Concluye que los empleados que sean despedidos sin justa causa de una instalación de esta naturaleza no tienen derecho a que se tome en consideración, para computar la mesada, los años de servicio prestados previamente al Departamento de Salud del Estado Libre Asociado.
La Mayoría razona que la Ley Núm. 80, supra, no cubre a los empleados gubernamentales, porque éstos ya están protegidos por un interés jurídicamente reconocido en la retención de su empleo y por las garantías que les concede el principio del mérito y la legislación aplicables al personal del servicio público. Entiende, entonces, que incluir los años de servicio público en el cómputo de la mesada que debe pagar el nuevo patrono brindaría a estos empleados un beneficio mayor al de cualquier otro empleado de la empresa privada. Por eso concluye que cuando una entidad pública se convierte en una empresa privada, el derecho a la mesada de los ex empleados públicos que sean despedidos injustificadamente por el nuevo patrono no debe incluir los años de servicio público trabajados previamente en el mismo establecimiento. En esencia, la opinión mayoritaria resuelve que los años de servicios prestados a un patrono anterior se tomarán en cuenta al computar la mesada sólo si el empleado despedido sin justa causa estaba protegido por la Ley Núm. 80, supra, antes de que se traspasara la empresa al nuevo patrono.
Según la opinión, el propósito de la doctrina del negocio en marcha es evitar que las protecciones que provee la Ley Núm. 80, supra, al empleado se vean afectadas por el traspaso de titularidad de su lugar de empleo. Ello implica que si la Ley Núm. 80, supra, no cobija inicialmente a estos empleados, no hay protección estatutaria que se afecte por la venta o transferencia de la empresa. De esta forma, el empleado de una institución perteneciente a una agencia *274 gubernamental que sea privatizada pierde esos años de servicio público para efectos de la mesada, al ser retenido por la empresa privada que adquirió dicha facilidad pública. Como a su lugar anterior de empleo no le aplicaba la Ley Núm. 80, supra, el ex empleado público no puede trasladar los años de servicio ofrecidos a su patrono anterior.
Por otro lado, la Mayoría del Tribunal resuelve que una entidad gubernamental no es ni puede ser un “negocio en marcha”, según se expone en la Ley Núm. 80, supra. Razona la Mayoría que la ley regula “esencialmente” las relaciones laborales de las empresas privadas lucrativas, y que las disposiciones de la Ley Núm. 80, supra, no se extienden a las relaciones laborales entre el Departamento de Salud y sus empleados. Al no aplicar la ley a las agencias del Gobierno del Estado Libre Asociado de Puerto Rico, éstas tampoco pueden estar incluidas en el concepto “negocio en marcha” del Art. 6 de la Ley Núm. 80, supra. Por consiguiente, la doctrina del negocio en marcha sólo puede referirse al traspaso de negocios privados y no a la transferencia de entidades gubernamentales, incluso cuando éstas sean vendidas mediante un proceso de privatización. Cabe señalar que se llega a esta conclusión sin examen alguno de ese proceso.
Además de lo anterior, la Mayoría del Tribunal también descarta la aplicación al caso de autos de la doctrina del patrono sucesor, establecida y desarrollada en nuestra jurisprudencia. Véanse, e.g.: Piñeiro v. Int’l Air Serv. of Puerto Rico, Inc., 140 D.P.R. 343 (1996); Bruno López v. Motorplan, Inc. y otros, 134 D.P.R. 111 (1993); Beaunit of Puerto Rico v. J.R.T., 93 D.P.R. 509 (1966). Determina en cuanto a esta doctrina que en “los hechos de este caso ... no se encuentran presentes los factores o las circunstancias que generalmente han dado lugar a su aplicación”. Opinión mayoritaria, pág. 268. A su vez, concluye que la inmunidad concedida por el Art. 22 de la Ley Núm. 190, supra, 24 L.P.R.A. sec. 3320, contra las reclamaciones laborales fundamentadas en hechos o eventos que sean imputables al *275 Gobierno de Puerto Rico impide la aplicación de la doctrina del patrono sucesor a las empresas que adquieran alguna instalación pública de salud al amparo de esta ley.(1)
M í-H
Esta interpretación de la Ley Núm. 80, supra, desvinculada del proceso de privatización, y en extremo mecánica, contradice la política pública ínsita a dicha ley, además de que trastoca las normas de hermenéutica aplicables a las reclamaciones laborales. Hemos reconocido consistentemente que las leyes laborales, al ser instrumentos de justicia social, deben ser interpretadas liberalmente para cumplir con sus propósitos reparadores de garantizar la mayor protección de los derechos de la clase trabajadora. El efecto de esta norma liberal de interpretación es que toda duda, en cuanto a la aplicación de una disposición legal laboral, debe resolverse a favor del empleado. Jiménez, Hernández v. General Inst., Inc., 170 D.P.R. 14 (2007); Cintrón v. Ritz Carlton, 162 D.P.R. 32 (2004); Piñero v. A.A.A., 146 D.P.R. 890, 902 (1998); Muñoz Hernández v. Policía de P.R., 134 D.P.R. 486, 495-496 (1993). En el caso de autos, este principio exegético fue desatendido por la Mayoría de este Tribunal. Veamos.
La aprobación de la Ley Núm. 80, supra, representó un paso significativo en la política laboral puertorriqueña de la protección del empleo. Su propósito principal es proteger al trabajador en la tenencia de su empleo y, a su vez, desalentar los despidos caprichosos e injustificados. Por eso, la ley provee una indemnización a los empleados que hayan *276 sido despedidos injustificadamente, siendo justa causa para el despido, aquellas circunstancias prescritas en el propio estatuto. El remedio de la mesada sirve de resarcimiento al empleado por los daños y perjuicios sufridos a consecuencia del despido injustificado, no constituye una remuneración o salarios por servicios prestados. Alvira v. SK & F Laboratorios Co., 142 D.P.R. 803, 810 (1997). La mesada se estableció como un alivio parcial a la situación de desamparo que enfrenta un empleado al perder su medio habitual de sustento, permitiéndole una ayuda económica para sostener a su familia en la transición a un nuevo empleo sin tener que convertirse en una carga para el Estado. Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 547 (1979).
La Ley Núm. 80, supra, es el estatuto general de despido que aplica a todo despido injustificado, excepto en aquellas situaciones que están cobijadas por alguna otra ley laboral específica de carácter excluyente. En esos contextos fácticos protegidos por esas otras leyes, los remedios provistos pueden ser superiores a los de la Ley Núm. 80, supra, ya que pueden incluir la reposición del trabajador en su empleo. Sin embargo, en situaciones no cubiertas por alguna otra legislación, la mesada es el remedio estatutario para los empleados despedidos sin justa causa. Véanse: Oficina del Procurador del Trabajo, Guías para la interpretación y aplicación de la Ley Núm. 80, Departamento del Trabajo y Recursos Humanos de Puerto Rico, 1979, pág. 6; R.N. Delgado Zayas, Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño, San Juan, [sin Ed.], 2005, págs. 114-115.
Hemos visto que la Ley Núm. 80, supra, también protege a los empleados de una empresa que son retenidos en su empleo por un nuevo dueño, haciéndole responsable del pago de la mesada como si dichos empleados le hubiesen prestado servicios desde que comenzaron a trabajar para el patrono anterior. Art. 6 de la Ley Núm. 80, supra; Guías para la interpretación y aplicación de la Ley Núm. 80, op. *277 cit., pág. 44. Cuando el nuevo dueño adquiere el negocio en marcha, los empleados del patrono anterior que sean retenidos mantienen el mismo estatus que tenían cuando se trasladó la titularidad de su lugar de empleo. En otras palabras, si al ser retenido por el adquirente el empleado tenía carácter de permanente en el negocio en marcha, mantendrá esta condición ante el nuevo patrono. Id., pág. 47.
La razón de ser de esta doctrina es que estos empleados retenidos, a través de su antigüedad y los años de trabajo con el dueño anterior, han adquirido unos derechos que no pueden ser ignorados cuando su patrono opta por traspasar el lugar de empleo a un nuevo dueño. Véase C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. JTS, 2003, T. I, pág. 135. Cuando el nuevo dueño mantiene en la nómina de la entidad adquirida a empleados del dueño anterior, se beneficia de la experiencia y el conocimiento específico adquiridos por éstos a través de los años, además de la plusvalía por razón de su trabajo. Esto, indudablemente, redunda en beneficio del negocio y del nuevo patrono, por lo que si éste despide a alguno de ellos injustificadamente, debe pagar la indemnización completa que exige la ley, tomando en consideración los años servidos al patrono anterior.
Ahora bien, la ley no distingue entre tipos de empresa para limitar su aplicación. No requiere que la entidad adquirida sea de determinada naturaleza. La ley dispone escuetamente que se le acreditará en la mesada “el tiempo que [los empleados] lleven trabajando en el negocio bajo anteriores dueños”. (Énfasis suplido.) 29 L.P.R.A. sec. 185f. Específicamente, no requiere que el patrono anterior tuviera la obligación legal de pagar mesada ante un despido injustificado. El Art. 6, supra, se refiere al “traspaso de un negocio en marcha”, sin precisar si dicho “negocio” traspasado debe ser privado, lucrativo o comercial, ni prohibir expresamente que sea una entidad pública de naturaleza privatizable.
*278 Provoca confusión el énfasis que da la opinión mayoritaria al interés “lucrativo” que deben tener las empresas a las cuales les aplica la Ley Núm. 80, supra. La opinión da a entender que las disposiciones de la ley sólo aplican a las entidades de “índole comercial y empresarial” y alude a la mención en la ley de entidades de “comercio, industrias y negocios”. Para apoyar su conclusión, cita del historial legislativo de la Ley Núm. 80, supra, que a su entender demuestra que la Asamblea Legislativa pretendía, con este lenguaje, que las disposiciones de la ley sólo protegieran a los empleados de “ ‘comercio, industria o cualquier otro negocio lucrativo Opinión mayoritaria, pág. 262, citando el Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes sobre el P. del S. 1112 de abril de 1976, 7ma Asamblea Legislativa, 4ta Sesión Ordinaria, pág. 1.
Esta es una interpretación desafortunada del historial legislativo, pues la frase del informe que cita la opinión mayoritaria no se refería a la Ley Núm. 80, supra. Lo que se indica en el informe citado es que la predecesora de la Ley Núm. 80, supra, la Ley Núm. 50, supra, protegía a los empleados de negocios lucrativos, y que uno de los propósitos de la nueva ley era eliminar este requisito de lucro sin el cual la Ley Núm. 50, supra, no aplicaba. Véase Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes de Puerto Rico sobre el P. del S. 1112, supra, pág. 2.(2) Por eso, mientras que la Ley Núm. *279 50, supra, sólo cobijaba al empleado “de comercio, industria o cualquier otro negocio lucrativo”, la Ley Núm. 80, supra, eliminó la condición de “lucrativo” y añadió “cualquier otro negocio o sitio de empleo”. (Énfasis suplido.) 29 L.P.R.A. sec. 185a (ed. 1966). En fin, la opinión mayoritaria restringe excesivamente el alcance de la palabra “negocio”, sin tomar en consideración que una interpretación teleológica, es decir, verdaderamente guiada por el propósito de la Ley Núm. 80, supra, demuestra que ésta buscaba expandir el ámbito de la protección laboral, descartando el ánimo de lucro como medida de aplicación para asegurar así la protección más efectiva a los empleados despedidos injustificadamente.
En el caso de autos, la opinión mayoritaria desdeña el principio liberal de exégesis reconocido en nuestro ordenamiento que nos obliga a interpretar todo estatuto laboral de la forma más justiciera y remedial posible. Esta metodología de interpretación liberal nos impide introducir restricciones al alcance de una disposición estatutaria laboral, cuando dichas limitaciones no están contenidas expresamente en la propia ley. La exclusión de un empleado de los beneficios de la legislación laboral debe desprenderse de forma clara y manifiesta de sus disposiciones, y en todo caso de interpretarse restrictivamente. Muñoz Hernández v. Policía de P.R., supra, pág. 496; López Vega v. F. Vega Otero, Inc., 103 D.P.R. 175, 177 (1974).
Para situaciones como la que aquí tenemos que resolver, la doctrina del “traspaso de un negocio en marcha”, según estatuida en el Art. 6 de la Ley Núm. 80, supra, expone de forma clara los elementos para su aplicación. En primer lugar, tiene que haber un patrono anterior, dueño de un establecimiento que sea el lugar de trabajo para determinados empleados. Luego, el establecimiento laboral o “negocio en marcha” debe ser adquirido por un nuevo dueño. En tercer lugar, el nuevo adquirente debe optar por conservar en la empresa adquirida a los empleados del dueño anterior, adviniendo de esta forma a ser su nuevo patrono. Por último, se requiere que el nuevo patrono despida sin *280 justa causa a alguno de estos empleados retenidos, siendo así responsable de pagar la indemnización conforme lo requiere la ley, incluyéndose en el cómputo de la mesada los años de servicio prestados al patrono anterior.
En cuanto al patrono anterior, la ley no establece condición alguna. En particular, la disposición estatutaria no requiere que el patrono anterior estuviera sujeto a la Ley Núm. 80, supra. Sin embargo, la opinión mayoritaria suple el silencio legislativo en cuanto a este aspecto introduciendo una limitación al alcance de la ley. Con ello se aparta de los principios generales de interpretación de las leyes laborales y adopta una interpretación contraria a la política pública de la ley, que aspira a brindar la protección más eficaz posible a la seguridad del empleo de los trabajadores en Puerto Rico. El resultado es añadir al Art. 6 de la Ley Núm. 80, supra, algo que el legislador no contempló, dos tipos de negocio en marcha para efectos de la mesada: uno en el cual los empleados acreditan el tiempo que trabajaron para el patrono anterior, y otro en el cual los empleados simplemente pierden estos años de servicio.
Sin embargo, en la médula del razonamiento de la opinión mayoritaria se encuentra, realmente, su convencimiento de que una instalación pública, aun cuando sea vendida a un ente privado, no es ni puede ser un “negocio en marcha” para efectos de la Ley Núm. 80, supra. Como hemos señalado, llega a esta conclusión utilizando un método contrario a los principios básicos de interpretación de la legislación laboral. Pero también llama la atención la ausencia de un análisis de las particularidades del proceso de privatización. Ese análisis, que me parece insoslayable, demuestra que estas entidades privatizadas constituyen un negocio en marcha para efectos de la ley.
HH HH I—I
La privatización de empresas públicas cobró auge durante la segunda mitad del siglo XX. Particularmente, los *281 decenios finales del milenio pasado fueron testigos de la transferencia por diversos estados de funciones y activos públicos al sector privado. Esta transformación gubernamental que se conoce como privatización es una combinación de fenómenos y procesos diferentes, en los cuales se destaca la participación del sector privado en campos tradicionalmente ocupados por la acción gubernamental, disminuyéndose de esta forma el rol participante del Estado en los asuntos socioeconómicos. R.J. Cao García, Planificación y Privatización, 1 (Núm. 2) Ceteris Paribus: Revista de Investigaciones Socioeconómicas 113, 117 (1991). Por lo tanto, la privatización funciona como un proceso de reorganización de las prioridades sociales de un gobierno, para someter ciertas actividades gubernamentales y la prestación de ciertos servicios públicos a las dinámicas económicas del mercado. De esta forma, el sistema burocrático gubernamental es reemplazado por empresas privadas y los favorecidos por estos servicios públicos son transformados en clientela. K.R. Rosar, Privatization and the Federal Government: An Introduction, Congressional Research Service, 28 de diciembre de 2006, pág. 6.
Las teorías normativas que justifican la doctrina de la privatización se originan en el siglo XVIII. La política pública que apoya el proceso de privatizar servicios gubernamentales está inspirada en la visión individualista del laissez faire y las teorías económicas del libre mercado, que promueven la competencia en el mercado y la disminución de la intervención gubernamental. También promueve la privatización, el pensamiento neoconservador, desarrollado durante las últimas décadas del siglo XX, que visualiza la privatización como una estrategia política para reducir la llamada "sobrecarga” del Estado. R Starr, The Meaning of Privatization, 6 Yale L. & Pol’y Rev. 6, 20 (1988).
No obstante, la privatización, tal y como se ha desarrollado actualmente, funciona como un instrumento de ejecución del neoliberalismo y, al igual que éste, aspira a resta *282 blecer plenamente los mecanismos del mercado, disminuir el rol decisorio del Estado en los mercados de bienes y servicios, encauzar la economía en manos privadas, encontrar acceso al capital del comercio internacional, y permitir el funcionamiento de una llamada libertad económica. H. Agudelo Villa, Estado, política de desarrollo y privatización, en ¿Privatización o estatización? Perspectivas de un debate, Bogotá, Departamento de Publicaciones de la Cámara de Comercio de Bogotá, 1989, págs. 42-44. La premisa clásica a favor de la privatización es el argumento de que las empresas privadas, compelidas por el ánimo del lucro y la maximización de ganancias, son más eficaces que el Estado para ofrecer servicios a la ciudadanía. H.A. Ríos Maury, Privatización: formas, mitos y aspectos gerenciales, San Juan, Eds. Nueva Aurora, 1998, pág. 47. Se fundamenta, pues, en una visión escéptica del Estado en su rol de proveedor de servicios y en una percepción de éste como un empresario incompetente e improductivo.
Son numerosas las explicaciones y justificaciones para la adopción de la privatización como una opción para la reconfiguración de las relaciones entre el Gobierno y el sector privado. En Puerto Rico se ha defendido la implantación de esta política fundamentada en las condiciones socioeconómicas prevalecientes desde las últimas décadas del siglo pasado. Éstas, a su vez, se han identificado por algunos economistas como resultado de las políticas gubernamentales intervencionistas adoptadas en respuesta a la desaceleración de la economía a partir de los años sesenta. Estas políticas, junto a otros factores, resultaron en una nómina pública abultada y recursos que se percibían mal distribuidos y utilizados.(3) Véase Cao García, supra, págs. *283 127; Consejo de Planificación Estratégica del Sector Privado, Informe final: privatización de los servicios públicos (fase 2), Cámara de Comercio de Puerto Rico, 1989, págs. 7-9.
Como respuesta a esta situación, se ha planteado la idea de redefinir el papel del Estado como proveedor de servicios. Así, se propuso el proceso de privatización en Puerto Rico como una forma de atraer recursos del sector privado para proveer determinados servicios públicos e incrementar la eficiencia de éstos, además de proveer métodos alternos de financiamiento y aumentos en los recursos fiscales del Gobierno. Consejo de Planificación Estratégica del Sector Privado, op. cit, pág. 9.
La privatización es un proceso que puede manifestarse en diversas formas.(4) De los numerosos modelos de privatización disponibles, el más utilizado en Puerto Rico y en la mayoría de los países que han optado por acogerse a este proceso es el del traspaso de las actividades gubernamentales al sector privado mediante la venta de activos de una *284 agencia o corporation pública.(5) En esencia, la venta de una entidad gubernamental lo único que altera es el estado legal de ésta, ya que pasa de ser propiedad pública a privada. En el caso de la venta total de una entidad pública, el traspaso de titularidad indica usualmente sólo un cambio en la administración y gerencia de la entidad, pero no en su estructura y, en ocasiones, tampoco en su personalidad. Consejo de Planificación Estratégica del Sector Privado, Informe final: privatización de los servicios públicos (fase 1), Cámara de Comercio de Puerto Rico, 1988, pág. 5. Ello se debe a que son precisamente la estructura y la personalidad de una entidad pública las que atraen la atención de los licitadores para su compra. De la misma forma, éstos también buscan adquirir como clientela suya a aquellos ciudadanos que utilizan estos servicios públicos. En la situación descrita, y como cuestión de realidad, la entidad pública se vende como un negocio en marcha (ongoing business o going concern), o sea, transfiriéndola en su totalidad como una unidad comerciable. Otra opción sería no venderla como un todo, sino disolverla como empresa y, de esta forma, vender sus bienes y activos de forma individual. E.S. Savas, Privatization and Public-Private Partnerships, Nueva York, Chatham House Pubs., 2000, págs. 129-132; Charles Vuylsteke, Techniques of Privatization of State-Owned Enterprises: Methods and Implementation, 2da impresión, Washington, D.C., World Bank Technical Paper Number 88, 1989, Vol. I, págs. 20-21. Según esta segunda opción, el organismo público se desintegra como entidad, sus partes son vendidas de forma individual y no hay continuidad de servicios, sino una venta de bienes y activos.(6) Así, mientras en la opción de la venta *285 como negocio en marcha se traspasa una operación para su continuación, en la segunda hay una desintegración total.
Es la venta de la entidad pública como negocio en marcha lo que permite a la empresa privada adquirente asumir la identidad del establecimiento vendido. En estos casos, la nueva empresa continúa ofreciendo servicios de igual o similar naturaleza a los ofrecidos por el Estado. A su vez, utiliza la misma estructura para sus operaciones, con el mismo equipo y usualmente métodos de producción similares. En ocasiones, además, conserva la misma fuerza obrera para la operación de la empresa, ahora manejada con ánimo de lucro. Es precisamente por estas razones, que los estudiosos del tema hablan de la entidad pública vendida como un negocio en marcha.(7)
h—I <
El sistema público de servicios de salud es uno de los sectores gubernamentales que se ha privatizado en épocas recientes. Como parte de la “reforma de salud” realizada en la década del noventa, se inició un proceso de privatización de algunos hospitales e instalaciones de salud, operados por el Departamento de Salud y la Administración de Facilidades y Servicios de Salud de Puerto Rico. Con este propósito se aprobó la Ley Núm. 190, supra, para permitir y reglamentar la transferencia de titularidad de las instalaciones públicas de salud al sector privado para que sean operadas como empresas privadas. Uno de los objetivos primordiales de la ley es permitir que la libre competencia *286 en la prestación de los servicios de salud sirva de aliciente para mejorar su calidad. Otro objetivo es retirar al Gobierno de su rol de proveedor de servicios, para entonces fortalecer su función de agente fiscalizador, evaluador y regulador de los sistemas de salud. Véanse: Informe de la Comisión de Gobierno de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 2479, 13 de junio de 1996; Informe de la Comisión de Gobierno del Senado de Puerto Rico sobre el P. de la C. 2479, 21 de junio de 1996.
A diferencia de legislaciones anteriores, la Ley Núm. 190, supra, permite delegar o ceder la operación de las instalaciones de salud a empresas privadas, así como arrendarlas o traspasar su titularidad. La ley le concede al Secretario de Salud la discreción necesaria para arrendar, subarrendar, vender, ceder, permutar o transferir permanentemente las instalaciones de salud, cuya titularidad pertenezca al Gobierno, a sus agencias o sus instrumentalidades. 24 L.P.R.A. see. 3320. En la ley se adopta como definición de “instalación de salud”, la que dispone la Ley de Facilidades de Salud, 24 L.P.R.A. sees. 331-333p. El concepto es tan amplio como para abarcar cualesquiera de los establecimientos que se dedican a la prestación de servicios de salud, sean hospitales, centros de salud, centros de diagnóstico y tratamiento, casas de salud, centros de rehabilitación, instalaciones de cuidado de larga duración, entre otros. 24 L.P.R.A. sec. 331a. Ahora bien, la Ley Núm. 190, supra, expande esta definición para incluir dentro del concepto “instalación de salud” al “equipo y el inventario instalado en, o utilizado en relación con la operación de la misma”. 24 L.P.R.A. sec. 3301h.
La ley ordena que todo acuerdo de transferencia de una instalación de salud pública a una entidad privada deberá seguir las disposiciones que la misma ley establece. 24 L.P.R.A. see. 3302. En particular, las entidades privadas contratantes están obligadas a utilizar las instalaciones *287 adquiridas en un ambiente de cuidado de salud dirigido, que sea cónsono con los propósitos de la ley y la filosofía de la reforma de salud. 24 L.P.R.A. see. 3305. En cuanto a la operación de las instalaciones privatizadas, las disposiciones estatutarias son muy cuidadosas al disponer que los servicios médicos que ofrecen las instalaciones de salud serán continuos y no se verán afectados por el proceso de transferencia a entidades privadas.
En primer lugar, la ley indica que toda propuesta de las entidades interesadas debe tomar en consideración la organización estructural y funcional de los servicios de salud de la instalación particular. A base de esto, se hará un plan de trabajo divido en fases, para entonces poder implantar la organización y los servicios que contemple establecer el licitador. 24 L.P.R.A. see. 3307. En segundo lugar, al evaluar las propuestas sometidas para adquirir una instalación, el Secretario de Salud debe determinar qué modelo de transferencia será el más apropiado, según la instalación de salud que se trate, las circunstancias económicas de la región en que se ubique y las necesidades y características de la población que sirve. 24 L.P.R.A. see. 3308. Incluso, la ley establece expresamente que como único se podrá eximir a la entidad contratante de continuar ofreciendo servicios de cuidado de salud en la instalación adquirida es mediante una determinación del Secretario de Salud y del Banco Gubernamental de Fomento a estos efectos y que indique que la región en la que está localizada la instalación, ya está adecuadamente servida por otras facilidades de salud. 24 L.P.R.A. see. 3305.
Cabe destacar otro asunto en cuanto al proceso de privatización de las instalaciones de salud públicas. La Ley Núm. 190, supra, señalaba originalmente, en su Art. 21, supra, que el precio mínimo de venta de la instalación sería aquel que, por tasación, dispusiera el Departamento de Hacienda o el de Salud. No obstante, la Ley Núm. 31 de 6 de julio de 1997 (24 L.RR.A. sees. 3315-3325, 334f-6a y 334f-7; 22 L.RR.A. see. 906, y 3 L.RR.A. see. 765) enmendó esta disposición para establecer el valor de mercado como *288 el precio de venta de cada instalación. 24 L.P.R.A. see. 3320. Tanto la Exposición de Motivos de la Ley Núm. 31, supra, como su historial legislativo muestran que la intención del legislador era que el precio de la instalación no fuese un valor de tasación de reemplazo de un inmueble. Por el contrario, se entendió que durante la venta de las instalaciones de salud deberían tomarse en cuenta otros factores adicionales, entre ellos el equipo que habría de transferirse y otras variables del mercado. Véase Informe de las Comisiones de Gobierno y de Salud de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 691, 17 de junio de 1997. Así, al momento de determinar el precio de venta de la instalación se estimará su valor global, tomando en consideración la estructura, organización, potencial y los otros factores ya mencionados.
Conforme a lo anterior, se colige forzosamente que las disposiciones de la Ley Núm. 190, supra, disponen para la venta de las instalaciones públicas de salud como negocios en marcha. Primeramente, la ley da énfasis a que la entidad contratante no interrumpa los servicios médicos que ofrece la instalación vendida durante el proceso de privatización, y que luego del traspaso su operación se mantenga ajustada a las necesidades y características de la población servida por cada instalación. El estatuto no le concede discreción a la entidad contratante para darle otro uso a la instalación adquirida que no sea aquel indicado en la ley, salvo autorización expresa del Secretario de Salud y el Banco Gubernamental de Fomento. En otras palabras, la instalación que sea privatizada deberá continuar utilizándose para ofrecer servicios de cuidado de salud conforme a la política estatal de salud pública. Ello asegura una continuidad estable entre los servicios que antes ofrecía el Gobierno y los que ofrecerá posteriormente la entidad privada adquirente, además de servir de barómetro para asegurar que la operación de la instalación adelante los propósitos primordiales de la ley y la filosofía de la llamada reforma de salud.
*289 Segundo, el proceso de privatización de la Ley Núm. 190, supra, no sólo incluye la venta de estructuras físicas, sino que incluye el equipo e inventario ya instalado en las instalaciones para ofrecer los servicios de salud. A esto se le puede añadir que la ley también dispone expresamente para la retención por la entidad contratante de los empleados que trabajaban para el Gobierno en la instalación adquirida. 24 L.P.R.A. see. 3318. Así, la venta de las instalaciones que hace el Gobierno no es de activos o de bienes individuales, sino de un establecimiento con todos sus componentes, transferidos como una unidad integral.
Lo último, mas no menos importante, son los factores que han de considerarse al determinar el precio de venta. Como parte de esta determinación, no sólo se consideran los elementos estructurales y operativos de la instalación, sino también el valor en el mercado que posee dicha entidad. Fijar el valor del mercado también requiere evaluar otros factores de índole económica, como son los rendimientos financieros que genera o podría generar la actividad desde un punto de vista privado. O sea para obtener el máximo valor de retorno, el precio se fija, considerando la instalación como una unidad comercial integra y como un negocio continuo.
La venta de una instalación de salud pública, como un negocio en marcha, asegura la maximization de las ganancias que puede obtener el Gobierno en la transacción. Precisamente, en Puerto Rico, una de las razones de peso para privatizar es adquirir fondos con la venta de la entidad para intentar aliviar la crisis fiscal del Estado. Véase E. Irizarry Mora, Privatización de empresas públicas: Apuntes teóricos pertinentes al caso de Puerto Rico, 1 (Núm. 1) Ceteris Paribus: Revista de Investigaciones Socioeconómicas 151, 152 (1991). Debido a sus propósitos intrínsecamente económicos, la privatización requiere la transformación de funciones estatales de beneficencia y asistencia social en servicios y productos comerciales. No nos debe extrañar, por lo tanto, que para que el Gobierno pueda vender una entidad de servicios públicos, tenga que merca *290 dearla como un negocio rentable. Aunque nos parezca incómodo asignarle un valor económico a los servicios de naturaleza benéfica y filantrópica, como lo son los servicios médicos primarios, la privatización requiere adoptar una visión negociable de estas instituciones.
V
Aplicando este marco teórico y jurídico a situaciones como la del caso de autos, no podemos concluir otra cosa que no sea resolver que una instalación gubernamental de salud que ha estado sujeta a un proceso de privatización es vendida, de hecho, como un negocio en marcha. De otro modo, estaríamos hablando de una venta pública de bienes gubernamentales. Como hemos discutido, la Ley Núm. 190, supra, no establece un proceso de liquidación de entidades públicas para vender sus parte como bienes o activos individualizados. Por el contrario, la ley formula una oferta de venta globalizada y obliga a que los adquirentes mantengan una continuidad en la prestación de servicios de la instalación que les sea transferida. La oferta de compra no sólo incluye el equipo que utilizaba el Gobierno para ofrecer los mismos servicios, sino que permite, además, que las entidades contratantes retengan en su nómina a los empleados públicos que laboraban originalmente para el Departamento de Salud.
La entidad pública se traspasa al sector privado en función de una unidad integral o, como apropiadamente lo han llamado los estudiosos del fenómeno de la privatización, la venta de un negocio en marcha (ongoing business). Es claro que según la Ley Núm. 190, supra, la entidad contratante al adquirir una instalación de salud pública asume su identidad como proveedor de servicios de cuidado de salud. Estos establecimientos se adquieren con la intención de continuar proveyendo servicios de la misma naturaleza que los que ofrecía el Estado, porque así lo requiere la ley, y utilizando la misma estructura física, con el mismo equipo e, incluso, la misma fuerza obrera en las operacio *291 nes diarias de la entidad. En conclusión, la venta de una instalación de salud pública presenta varios de los factores que apoyan la aplicación de la doctrina del traspaso de un negocio en marcha según dispuesta en el Art. 6 de la Ley Núm. 80, supra.(8)
Por todo lo anterior, resolvería que, al momento de computar la mesada a la que pueda tener derecho la señora Mercado Ortiz, se deben tomar en consideración los años que esta empleada trabajó para el Departamento de Salud antes que la instalación de salud en la que laboraba pasara a manos de una empresa privada. La señora Mercado Ortiz fue servidora pública por casi dos décadas antes que el Hospital de Área Tito Mattei de Yauco, que servía como su lugar de empleo, fuera privatizado en 1998 según lo per-mite la Ley Núm. 190, supra. Al comprar el hospital, la entidad contratante, Adventist Health System Corp., ad-vino como patrono de la señora Mercado Ortiz, ya que retuvo sus servicios junto a los de otros empleados del Departamento de Salud. Sin embargo, en el 2001 el nuevo patrono de la señora Mercado Ortiz la despidió. Antes del despido, Adventist Health System Corp. se benefició de la experiencia y el conocimiento especializado de la señora Mercado Ortiz, al igual que se sirvió de su familiaridad con la instalación en la que trabajaba y de la plusvalía que su labor representaba.
Indudablemente, y como explicamos anteriormente, al utilizar el procedimiento de la Ley Núm. 190, supra, Adventist Health System Corp. adquirió del Gobierno el Hospital Tito Mattei de Yauco como un negocio en marcha. Por lo tanto, le aplicaba el Art. 6 de la Ley Núm. 80, supra. Por *292 tal razón, debimos confirmar al Tribunal de Apelaciones en cuanto resolvió que el legislador no excluyó la consideración de los servicios prestados a patronos anteriores por un empleado que fue retenido por la entidad adquirente de un hospital público para los efectos de terminar su mesada al amparo de la Ley Núm. 80, supra. En ausencia de una exclusión categórica, la señora Mercado Ortiz tiene un derecho estatutario a que se le aplique la fórmula de cálculo de la mesada tal y como está establecida en la Ley Núm. 80, supra. Como la opinión mayoritaria llega a un resultado que ignora estas consideraciones y que es contrario a la naturaleza justiciera y remedial de nuestras leyes laborales, me veo obligada a disentir.
VI
Por último, debo puntualizar otra razón para mi disenso. No podemos perder de perspectiva que la privatización, como proceso político y socioeconómico, afecta la seguridad de empleo de miles de empleados públicos. Cuando se vende una instalación de salud pública, la entidad adquirente puede retener a todos, a algunos o a ninguno de los empleados públicos que laboraban en el establecimiento adquirido. Debemos reconocer que ante el acontecimiento de un proceso de privatización el estatus laboral de estos empleados públicos sufrirá un cambio drástico y es, cuando menos, incierto.
De no ser retenidos por la empresa adquirente, estos empleados serán cesanteados con la sola promesa, no garantizada, de que serán reubicados en algún otro organismo público o empresa privada.(9) 24 L.P.R.A. sec. 3318. *293 Por otro lado, los “afortunados” que sean reclutados por la entidad adquirente perderán su estatus de empleados públicos, con todo lo que ello conlleva. Estos empleados dejarán de ser miembros del servicio público y perderán las garantías que les provee el principio de mérito, y los beneficios y las protecciones del sistema de empleados del Gobierno. Como empleados del sector privado, aun cuando estén protegidos por otras leyes laborales, estarán en una posición menos ventajosa que antes en cuanto a la seguridad de su empleo.
La opinión que suscribe una mayoría de este Tribunal peijudica aún más a estos empleados retenidos al resolver que de ser despedidos injustificadamente por su nuevo patrono, no tendrán acceso completo a la legislación social que protege a los demás empleados del sector privado. En otras palabras, estos otrora servidores públicos no estarán cobijados por las garantías y los derechos que provee el sistema del mérito, pero tampoco serán protegidos totalmente por aquella legislación que le aplica a la empresa privada. Como la opinión mayoritaria traza una ruta decisoria injusta para estos ex empleados públicos y contraria a la legislación social en protección de los trabajadores en Puerto Rico, yo disiento.

 El Art. 22 de la Ley Núm. 190 de 5 de septiembre de 1996 dispone, en lo pertinente:
“La entidad contratante o intereses privados que adquieran cualesquiera de las instalaciones de salud en virtud de lo dispuesto en este capítulo, estarán inmunes o exentos de reclamaciones de cualquier índole que de otro modo serán atribuibles al Gobierno de Puerto Rico, incluyendo, pero no limitándose a reclamaciones laborales, contractuales, torticeras, o extracontractuales siempre y cuando dichas reclamaciones estuviesen relacionadas con hechos o eventos ocurridos con anterioridad a la firma de los contratos de privatización.” 24 L.P.R.A. see. 3320.

 En el informe presentado ante la Cámara de Representantes sobre el P. del S. 1112, que se aprobaría como la Ley Núm. 80 de 30 de mayo de 1976, se señala:
“La ley actual [Ley Núm. 50\ protege a los empleados de comercio, industria o cualquier otro negocio lucrativo que estén contratados sin tiempo determinado contra la eventualidad de ser despedidos de su cargo sin justa causa, pero solamente concede una indemnización equivalente a un mes de sueldo en el supuesto de que se produzca el despido bajo las indicadas circunstancias.
“El proyecto que estamos considerando elimina el requisito de lucro sin el cual la ley actual no aplica y establece por primera vez en nuestra jurisdicción la indemnización progresiva por el despido injustificado, consistente dicha indeminización progresiva en una indemnización básica equivalente al sueldo de un mes y una indemnización progresiva adicional equivalente a una semana por cada año de servicios.” (Enfasis suplido.) Informe de la Comisión de Trabajo y Asuntos del Veterano de la Cámara de Representantes de Puerto Rico sobre el P. del S. 1112 de abril de 1976, 7ma Asamblea Legislativa, 4ta Sesión Ordinaria, págs. 1-2.

 Los economistas señalan que, a pesar de que Puerto Rico disfrutó de una tasa rápida de crecimiento económico durante las décadas siguientes a la posguerra, la economía registró una desaceleración severa que llevó a un estancamiento recesivo a partir de los años setenta. R. J. Cao García, Planificación y Privatización, 1 (Núm. 2) Ceteris Paribus: Revista de Investigaciones Socioeconómicas 113, 121-122 (1991). Recalcan que, por ello, el sector gubernamental puertorriqueño adquirió una impor *283 tancia creciente al intentar inyectarle dinamismo a la actividad económica mediante la estimulación de la producción y la creación de nuevos empleos. También señalan una serie de causas para que este rol protagónico llevara a hacer atractiva, décadas después, la alternativa de la privatización. En particular, destacan el aumento en gastos corrientes del Gobierno, específicamente en empleos públicos, y la desatención en las inversiones de infraestructura, lo que trajo como resultado una nómina gubernamental abultada y recursos mal distribuidos y utilizados. Cao García, supra, págs. 127; Consejo de Planificación Estratégica del Sector Privado, Informe final: privatización de los servicios públicos (fase 2), Cámara de Comercio de Puerto Rico, 1989, págs. 7-9.

 Entre los modelos de privatización más utilizados se encuentran: la subcontratación de actividades al sector privado; el uso de cupones (vouchers); la responsabilidad compartida del Gobierno y el sector privado para ofrecer un servicio, ya sea mediante empresas conjuntas, división de fases o incluso la competencia directa en el mercado; la liquidación de empresas o actividades gubernamentales; la acción comunitaria con estímulo gubernamental, donde el Estado dona activos, provee incentivos o traslada la administración de una actividad a comunidades, y el permiso para que asociaciones voluntarias o filantrópicas provean determinados servicios públicos. Consejo de Planificación Estratégica del Sector Privado, op. cit., pág. 5. Véase, también, Consejo de Planificación Estratégica del Sector Privado, Informe final: privatización de los servicios públicos (fase 1), Cámara de Comercio de Puerto Rico, 1988, págs. 4-9.

 Las alternativas dentro de este modelo son la venta total o parcial de la empresa a una entidad privada, la venta de acciones al público en general o la venta o donación de la empresa a empleados para que éstos la administren. Consejo de Planificación Estratégica del Sector Privado, Fase 2, op. cit., pág. 5.

 La liquidación de una empresa pública como una modalidad de privatización es utilizada por el Estado cuando, entre otras cosas, el propósito funcional de la *285 entidad ya no es relevante, inversionistas privados no están interesados en la compra de la entidad como un negocio en marcha o la planta física de la empresa a ser vendida tiene mayor valor comercial que el negocio como tal. E.S. Savas, Privatization and Public-Private Partnerships, Nueva York, Chatham House Pubs., 2000, pág. 217.

 El concepto “negocio en marcha”, como going concern, se usa también cuando el Estado vende todas o algunas de sus acciones en una empresa gubernamental. Esta forma de privatización requiere que el negocio en venta sea una corporación debidamente incorporada. Véase C. Vuylsteke, Techniques of Privatization of State-Owned Enterprises: Methods and Implementation, 2da impresión, Washington, D.C., World Bank Technical Paper No. 88, 1989, Vol. I, págs. 11-20.

 Tengo, además, grandes reparos en cuanto a la conclusión mayoritaria respecto a la inmunidad brindada por el Art. 22 de la Ley Núm. 190, supra, y la doctrina del patrono sucesor. Ello, porque la controversia particular del caso autos se resuelve mediante la aplicación adecuada de la Ley Núm. 80, supra, y nuestros principios básicos de hermenéutica judicial, y no requería, por lo tanto, que este Tribunal se expresara en cuanto al efecto que tiene la Ley Núm. 190, supra, sobre la posible aplicación de la doctrina del patrono sucesor en el contexto de un proceso de privatización. La Mayoría de este Tribunal se excedió en su función adjudicadora al resolver que en cualquier contexto de privatización de instalaciones de salud públicas la Ley Núm. 190, supra, hace inaplicable la doctrina del patrono sucesor.

 Los empleados públicos que no sean reclutados por el nuevo patrono podrían ser cesanteados por el Gobierno. Ante estas circunstancias, la Ley Núm. 190, supra, sólo ofrece como salvaguarda la política pública observada en Puerto Rico en los casos de reorganización y disolución de organismos gubernamentales. Según esta política, el empleado así cesanteado puede elegir entre acogerse a un retiro temprano, solicitar alguna compensación por el tiempo de servicio al Gobierno o solicitar su reubicación en el servicio público. Para aquellos empleados que ejerzan esta última opción, la Ley Núm. 190, supra, sólo dispone que se creará un registro especial *293 para concederle preferencia a estos servidores públicos para ser reubicados, según la disponibilidad que permitan las plazas, a través de los diferentes organismos gubernamentales y en la empresa privada. 24 L.P.R.A. see. 3318. Esta disposición estatutaria no garantiza a estos empleados cesanteados un empleo seguro en el Gobierno, ni siquiera que serán reclutados para cualquier otro trabajo.